**In the Matter of the Purported Last Will and Testament of Alice LANGMEIER, Deceased.**

Court of Chancery of Delaware, New Castle County.

Submitted: Sept. 28, 1982.

Decided: Aug. 3, 1983.

388

Joseph H. Geoghegan, and John E. James, of Potter, Anderson & Corroon, Wilmington, for the Caveator Wilmington Trust Co. and certain relatives of Alice Langmeier.

Mason E. Turner, and Elizabeth M. McGeever, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for the proponent Marlene J. Holland.

Richard W. Pell, of Tybout, Redfearn, Casarino & Pell, Wilmington, for Kentmere Home and the University of Missouri.

DECISION AFTER TRIAL.

JUDGMENT FOR THE CAVEATOR.

BROWN, Chancellor.

This matter involves the validity of the last will and testament of Alice Langmeier. The will in question was executed on August 13, 1981. Wilmington Trust Company, as trustee beneficiary under an earlier 1978 will executed by Alice Langmeier, has filed a caveat to the 1981 will seeking to deny its admission to probate. The basis for the caveat is that Alice Langmeier lacked testamentary capacity at the time of the execution of the challenged will and that the will

executed by her was the product of undue influence exerted upon her by her housekeeper and live-in companion of some four months. This is a decision after trial.

Under Delaware law, all such will-contest matters start with the presumption that a testator had the capacity to make a will at the time that it was made. *In re Barnes Will,* Del.Super., 18 A.2d 433 (1941); *Smith v. Day,* Del.Super., 45 A. 396 (1899). Consequently, it is the party attacking testamentary capacity who bears the burden of establishing that the decedent was legally incapable of executing a valid will, *Ethridge v. Bennett's Executors,* Del.Super., 31 A. 813 (1891), and the evidence as to the testator's capacity must relate to the time at which the will was executed. *In re Miller's Will,* Del.Super., 85 A. 803 (1912); *Smith v. Day, supra.* Likewise, the burden of proving undue influence rests on the party attacking the will. *Nardo v. Nardo,* Del.Supr., 209 A.2d 905 (1965). These standards necessarily mean that all cases such as this must turn on the facts and circumstances leading up to and surrounding the execution of the testamentary instrument.

The factual matters that go to make up this case are voluminous. The trial lasted for a period of nine days. A total of 27 witnesses were called, five of whom were medical experts. No one witness was merely cumulative of another. Each witness had something significant to add to the overall mix. Testimony as to certain critical aspects of the case was conflicting, in some instances even between witnesses for the same side. Because of the great number of factual matters relied upon by the parties, it would be unrealistic to attempt to deal with all or any substantial part of them in any detail. Accordingly, I set forth my findings of those matters which I deem to be pertinent and established by the evidence.

As previously indicated, Alice Langmeier executed the will in question on August 13, 1981. Five days later, on August 18, 1981, she fell and broke both an arm and a hip.

Upon her admission to the hospital on that date she was found by doctors who had never treated her before to be confused, suffering from a degree of senile dementia, lacking in memory and lacking in the ability to respond sensibly to clinical questions. Her condition failed to improve significantly thereafter and she died on November 6, 1981.

In summarizing my findings I divide the sequence of events into six categories. They include (1) the background of Alice Langmeier insofar as it bears upon the issues to be decided; (2) the advent of Marlene Holland, the proponent of the 1981 will, as her housekeeper and live-in companion and the effects of the development of that relationship through June 15, 1981; (3) the decision for Alice Langmeier to make a new will and the medical examinations of her prior to its execution; (4) the appointment of an independent guardian for the property of Alice Langmeier on July 30, 1981; (5) the execution of the will and an employment agreement for the benefit of Marlene Holland on August 13, 1981; and (6) the events subsequent to the fall of Mrs. Langmeier on August 18, 1981. Thereafter I shall list and discuss certain admissions and conflicts in the testimony which, to me, serve to dictate the outcome of the caveat. This is the best way that I can discern to deal with this complex, and yet highly interesting probate matter.

## I.

At the time that she executed the will in issue, Alice Langmeier was 85 years of age. During her lifetime she had apparently been an active and independent woman. Early in her life her first husband and her only child, a son, had died. She thereafter spent time in Europe and, later, in Florida. There is some evidence that she may have married a second time, but on the record this is uncertain. Late in life, in 1956, she married Arthur Langmeier, who himself had not been married previously. Alice and Arthur had known each other since their childhood days in the midwest and he had apparently kept in touch with her over the many years. The evidence also indicates that actually Alice and Arthur Langmeier were cousins, although this was apparently never made known by Alice Langmeier to her friends nor, insofar as can be ascertained, was it acknowledged by her prior to her death.

Arthur Langmeier died of cancer in 1976. He was a man of substantial wealth and made suitable provision for Alice through residual and marital trusts accompanied by the power of appointment reposed in her. Arthur Langmeier also made charitable dispositions under his will to several midwestern institutions, including the University of Missouri. The caveator, Wilmington Trust Company, was the trustee under the will of Arthur Langmeier and, after his death, it managed his testamentary trusts for the benefit of Alice. In 1978, with the assistance of Wilmington Trust Company, Alice Langmeier executed a will which basically made some small provision for certain relatives of Arthur Langmeier living in Missouri, but which left the major portion of her estate to the same charitable beneficiaries favored by Arthur Langmeier.

The significance of the foregoing is to bring out that at and immediately prior to her death Alice Langmeier had no kinfolk or relatives of her own. Although it may be that the relationship of cousin existing between her and Arthur made his relatives, to a degree, her blood relatives also, the evidence is clear that she never considered them as such. While she maintained regular contact with these "Missouri relatives" after Arthur's death, she always referred to them as being his relatives, not hers. She had no living children nor was she survived by any other living kin through her family. Thus, from 1976 onward, Alice Langmeier was basically alone in the world except for her chauffeur, her next-door neighbor, her part-time gardener, a few social acquaintances and her distant contact with Arthur's Missouri relatives. This is also significant when it is considered that the size of the estate which Alice Langmeier had available

to dispose of by will was substantially in excess of $1 million.

## II.

Against this backdrop we have the events leading to the present controversy. Alice Langmeier lived alone. In the spring of 1980 she fell and injured herself and thus required professional care and companionship during her recuperation. As a result of this event, when coupled with her advanced years, Lewis B. Hyman, the Wilmington Trust Company officer who maintained contact with Mrs. Langmeier, convinced her that it would be best if she had full-time live-in companionship thereafter. For this purpose he retained the services of Quality Care, a reputable business organization which provided such care and companionship to the elderly. Thereafter, through the early part of 1981, various employees of Quality Care resided with Mrs. Langmeier, usually with one person staying during the week and another on the weekends.

On March 29, 1981 Marlene Holland, then an employee of Quality Care, began living with Mrs. Langmeier five days per week. Another employee, who had been doing so since January, stayed with her on the weekends. On the evidence there seems no question that the relationship between Marlene Holland and Mrs. Langmeier immediately developed into a close one. Mrs. Langmeier liked Marlene and became a noticeably happier person after her arrival. She seemed to enjoy Marlene's company and worried about her when she was absent from the house for one reason or another.

Mrs. Langmeier had some difficulty in hearing. She also had difficulty with her vision. For this reason it had been her practice to have two social friends of hers, a Mr. and Mrs. Pawlikowski, assist her in writing checks to pay her bills, etc. Mrs. Pawlikowski would fill out the checks for her and Alice would sign them. By April 24, 1981, with the consent of Mrs. Langmeier, Marlene Holland relieved Mrs. Pawlikowski of this duty and took control of the checkbook. In this regard it is to be noted that at the time Mrs. Langmeier was maintaining an incredible balance of more than $140,000 in her checking account. Thereafter, on May 15, 1981 Marlene Holland became a joint signatory on that checking account along with Mrs. Langmeier.

The evidence further indicates that shortly after Marlene Holland took over the checkbook duties on behalf of Mrs. Langmeier, a new pattern developed with regard to the checks written. Specifically, checks began to be written payable to "Cash," and in substantial amounts. For example, during the three-month period prior to Marlene's arrival, only three checks were written to "Cash" by Mrs. Langmeier. They totaled $623. By contrast, during the four months after Ms. Holland's arrival 31 checks payable to "Cash" were written on Mrs. Langmeier's account totaling $13,597. Of that total $9,850 in checks were either endorsed or signed by Marlene Holland. According to Marlene Holland's testimony these all constituted gifts to her from Mrs. Langmeier.

In addition, it was established that during the middle of June Marlene Holland accompanied Mrs. Langmeier to her safety-deposit box for the purpose of removing and cashing Federal Series H Bonds having a value of $34,500. This sum, once the bonds were redeemed, was also given to Marlene Holland by Mrs. Langmeier. This, too, was a gift according to Ms. Holland. In summary, the evidence shows that during the four-month period of April 1981 through July 1981 Marlene Holland was the beneficiary of in excess of $42,000 in cash "gifts" given to her by Alice Langmeier.

While the financial well-being of Mrs. Holland was increasing as a result of her relationship with Mrs. Langmeier, other things of significance also occurred. By May 3, 1981, after she had been on duty as a five-day-a-week companion for scarcely more than a month, Ms. Holland provoked a confrontation with the Quality Care employee who had been staying with Mrs. Langmeier on the weekends. As a result, and with Mrs. Langmeier's approval, the

weekend companion was terminated and Ms. Holland thereafter began to live with Mrs. Langmeier full time.

In June, the Quality Care managerial personnel were made aware of the situation that was developing. Specifically, they learned that Marlene Holland had been accepting gifts from Mrs. Langmeier, something that was forbidden of its employees by Quality Care. As a result of a confrontation stemming from this, Ms. Holland resigned as an employee of Quality Care, and thereafter, again with the apparent consent and approval of Mrs. Langmeier, she became the private, full-time housekeeper and live-in companion employed directly by Mrs. Langmeier.

In addition, Marlene Holland became increasingly protective of Mrs. Langmeier. A June visit by the daughter of one of the Missouri relatives was effectively rebuffed. The visit lasted only some fifteen minutes with Ms. Holland never being too far out of earshot. Ms. Holland curtailed the visit by saying that Mrs. Langmeier had many appointments and was very busy at that time—something which is hardly borne out by the evidence. It is also significant that upon learning of the intended visit of the Missouri relative some two days before her arrival, Marlene Holland caused two checks to be written on Mrs. Langmeier's account. One was to "Cash" for $500—which she cashed. The other was a check for $5,000 made payable to herself. This latter check was written out of sequence from the back of the checkbook. Also, it was on the very day of the visit that Ms. Holland took Mrs. Langmeier to the bank to remove the Series H Bonds from her bank box.

The evidence also establishes that Ms. Holland systematically discouraged contact with Mrs. Langmeier by her next-door neighbor, by a domestic employee of her next-door neighbor who had long been friendly with Mrs. Langmeier, and by the Pawlikowskis, who had been accustomed to visiting with her two or three times per week. In fact, on June 21 Marlene Holland flatly refused the Pawlikowskis' admission to the house.

Finally, there is the matter of Mrs. Langmeier's contact with the Missouri relatives. While there was testimony offered on behalf of Marlene Holland to the effect that Mrs. Langmeier continually expressed a dislike for Arthur Langmeier's "Missouri relatives" because she considered them only to be after her money, there was also testimony on behalf of the caveator that she openly enjoyed receiving regular letters from them and that she also enjoyed speaking with them by telephone on a regular basis. As to which view is the more accurate, I take note that according to telephone company records Mrs. Langmeier herself placed some 150 telephone calls to the Missouri relatives during the five-year period from 1976 through March 1981. The calls from Mrs. Langmeier ceased after March when Marlene Holland came upon the scene.

From these highlights of the developing relationship between Marlene Holland and Mrs. Langmeier it is clear that by the middle of June, Marlene Holland had achieved a close and confidential position in the life of her new friend and employer. Thereafter, two significant developments occurred in the sequence of events. One was the decision to have Mrs. Langmeier execute a new will. The other was the actual execution of the will. The first is somewhat disturbing by its very nature, especially when the trimmings that go with it are added. That the second ever happened under the circumstances disclosed by the evidence is difficult to believe. I turn first to the decision to have Alice Langmeier execute a new will and the medical examinations of her that accompanied it.

III.

At some point presumably during the early part of June it was decided between Alice Langmeier and Marlene Holland that Mrs. Langmeier should make a new will. From the evidence I cannot be sure as to who was the originator of this idea. It is clear, however, that it was Marlene Holland

who suggested the attorney to perform the task. For this purpose, A. James Gallo, a practicing attorney and former judge, was contacted to handle the matter for Mrs. Langmeier. This was done despite the fact that a Mr. Maddock, a corporation attorney and personal friend of both Alice and Arthur Langmeier prior to his death, had drafted the 1978 will for Alice as well as the will which disposed of Arthur's estate. Mr. Maddock was still available, but was not contacted. Mrs. Langmeier had never met Judge Gallo before.

Between Judge Gallo and Marlene Holland—I do not feel that Mrs. Langmeier, a Christian Scientist, participated in any way in the decision—it was further decided that Mrs. Langmeier should be examined by a doctor so that there would be no question as to her competency to make a will. In keeping with the foregoing, it was Marlene Holland who suggested the doctor. For this purpose she selected Dr. Donald S. Hayes, a young doctor who was then her own personal physician. At the request of Marlene Holland, Dr. Hayes examined Mrs. Langmeier at her home on June 15, 1981. Because he considered his initial findings to be only tentative, however, Dr. Hayes scheduled a second examination for his office on June 26, 1981.

To his credit, Dr. Hayes realized that he was unfamiliar with the legal standards in Delaware pertaining to testamentary capacity. He was not a native of Delaware, he had not been in practice that long, and he had not been asked to pass upon the capacity of a person to make a will before, at least not in the setting in which he perceived himself to be. Consequently, prior to the second examination, he sought legal advice from a personal friend, L. Kent Wyatt, who was also an attorney. As a result, Mr. Wyatt was in attendance on June 26 when Dr. Hayes again examined Mrs. Langmeier. In fact, to a degree, Mr. Wyatt participated in the examination.

Following this second examination, Dr. Hayes sent a letter to Judge Gallo in which he summarized his findings as follows:

"In regard to her ability to draw up a will, Mrs. Langmeier can recall neither why or when she decided to draw a will. She has no knowledge of the extent of her possessions nor what she would like done with them. In being asked specific persons and things that she might leave possessions to she replies that she would like to leave her house to her housekeeper but she cannot recall her name, she would like something left to her chauffeur but she does not know what. She would like something left to charity but she does not know which charity or how much.

\* \* \* \* \* \*

"In summary then I find Mrs. Langmeier to be alert and oriented with the ability to make simple judgments required in daily living but I have significant reservation about her ability to perform more complex judgmental tasks. I do not feel that she demonstrates at this time the ability to draw up and execute a will in that she neither shows the ability to comprehend why she is doing this, what she is giving away and to whom: Three qualities which I would assume are important when the task of drawing a will is decided upon. I might mention also that the patient, Mrs. Langmeier, has significantly reduced visual and auditory capabilities so special attention would have to be paid to the fact that she fully comprehended the full extent of any paper she might sign."

Both Wyatt and Dr. Hayes received the distinct impression that Mrs. Langmeier did not seem all that interested in making a new will and that she appeared rather vague on the entire subject.

As a result of the response of Dr. Hayes, Judge Gallo sought a second opinion. For this purpose he contacted Dr. Irwin G. Weintraub, a clinical psychologist. Dr. Weintraub examined Mrs. Langmeier on July 7, 1981. The major portion of Dr. Weintraub's examination consisted of giving Mrs. Langmeier four psychological tests. These were the Wechsler Adult Intelligence Scale, Revised, a test composed of

eleven sub-tests from which the traditional I.Q. can be ascertained; the Wide Range Achievement Test, 1978 Version, which deals with word recognition; the Rorschach Test, a personality test consisting of ten ink blots to which the subject by free association is to respond; and the Bender-Gestalt, a test in which the subject is asked to duplicate several printed designs with the free hand use of a pencil. This latter test is used to ascertain organic brain damage.

The Wide Range Achievement test was unproductive because Mrs. Langmeier, due to her sight deficiency, could not read the print in the test booklet. The Wechsler test was administered orally by Dr. Weintraub. Of the eleven sub-tests that were given, Mrs. Langmeier registered six scores in which she was graded as having a defective I.Q., two scores that were borderline, two that registered dull normal, and only one that was average for a person of her age. Dr. Weintraub also found that she had organic brain impairment to the extent to be expected of a person her age. She was partially confused as to time and her memory was inconsistent.

At the same time, Dr. Weintraub found that her grasp on reality was adequate, that her emotional state was under control, that she suffered from no delusions or hallucinations, that she had no disabling characteristics as to her surface behavior, and that her ability for practical daily reasoning was adequate. He found her ability for abstract reasoning to be weak and inconsistent, but he concluded that if she was given proper assistance and was not rushed into a decision she could handle it. In summary Dr. Weintraub concluded that "with appropriate support and assistance" Mrs. Langmeier had the necessary capacity to make and execute a will. He so advised Judge Gallo.

It is significant that Dr. Weintraub did not question Mrs. Langmeier with regard to the nature and extent of her property, her desire to make a will or her testamentary plans. Also, all background information concerning Mrs. Langmeier was obtained by him from Marlene Holland. Moreover, Dr.

Weintraub candidly conceded that as of the time of his examination of Mrs. Langmeier, and indeed as of the time of the trial, he was not aware of the legal requirements for testamentary capacity under Delaware law.

Dr. Weintraub saw Mrs. Langmeier again on August 6, 1981. On this occasion he went to her house. Again, he did so at the request of Judge Gallo, who was also in attendance. At this meeting, according to Dr. Weintraub, Judge Gallo undertook to explain to Mrs. Langmeier the provisions of the will that he was preparing for her. On this occasion Dr. Weintraub conducted no examination. Apparently, his role at this meeting was simply to observe the demeanor and responsiveness of Mrs. Langmeier. To him, she seemed to be the same as when he examined her in his office on July 7, 1981. Dr. Weintraub did not see Mrs. Langmeier again until August 13, 1981, when, at the request of Judge Gallo, he acted as a witness to the execution of her will.

### IV.

While the medical examinations and other preparations for the making of a new will for Mrs. Langmeier were underway, there was developing simultaneously a concern for Mrs. Langmeier on the part of the Missouri relatives. The advent of Marlene Holland, theretofore a complete stranger, as her full-time, live-in companion coupled with the sharp fall in communications between Mrs. Langmeier and Arthur Langmeier's family members in Missouri caused the latter to fear that perhaps Mrs. Langmeier was being victimized, or was about to be, by designing persons who were after her money.

Because of this, Virginia Frenzel, the niece of Arthur Langmeier and the one with whom Alice Langmeier had maintained the most consistent contact by correspondence and telephone over the years following Arthur's death, paid an unannounced visit to Mrs. Langmeier in Wilmington on July 2, 1981. As a result, Mrs. Frenzel discovered that Alice was truly

fond of Marlene Holland. In her words, "Alice liked Ms. Holland, she really did."

At the same time Mrs. Frenzel also discovered that Alice had not been receiving her letters. She further noticed that it was necessary to proceed slowly in talking to Mrs. Langmeier. Alice was slow in responding to conversation and had to think hard before doing so. As a result of these and other factors, Mrs. Frenzel sought legal assistance and thereafter, on the advice of counsel, she petitioned this Court to appoint a guardian for the property of Alice Langmeier pursuant to the provisions of 12 *Del.C.* § 3914. That statute authorizes this Court, where it is satisfied on the record that it is appropriate to do so, to appoint a guardian for a person who, because of advanced age, mental infirmity or physical incapacity, is unable properly to manage and care for his property, and, as a consequence, is in danger of dissipating or losing his property or of becoming the victim of designing persons. In this latter respect, Mrs. Frenzel feared Marlene Holland. The guardianship petition was supported by the affidavit of Dr. Hayes to the effect that because of her advanced age, mental infirmity and physical incapacity, Mrs. Langmeier was unable to manage her property.

The guardianship petition was opposed on behalf of Alice Langmeier. In this regard, Gary Linarducci, an attorney in Judge Gallo's law firm, was assigned to represent her interests. After some haggling and negotiation on the matter between counsel, an order was eventually entered on July 30, 1981, appointing Delaware Trust Company as guardian for the property of Mrs. Langmeier. This was done by means of a stipulation between counsel for the parties and without any evidentiary hearing or findings by the Court. The order provided, among other things, and contrary to the wishes of Marlene Holland, that the $34,500 proceeds from the sale of the Series H. bonds be turned over to the guardian by Marlene Holland. It is also significant that at the time that the stipulated order was entered, Judge Gallo personally signed the document, thereby indicating his consent on behalf of Mrs. Langmeier to the appointment of the guardian.

Consequently, Delaware Trust Company, as guardian, promptly took over the affairs of Mrs. Langmeier, including her $140,000 checking account. Arrangements were made to have a small balance of several thousand dollars available for Mrs. Langmeier's day-to-day needs. The balance of the account was transferred to other income producing accounts. The guardian agreed to retain Marlene Holland as housekeeper at a specified salary. However, as of July 30, 1981, Marlene Holland could no longer sign checks on behalf of Mrs. Langmeier. As of July 30, 1981, control of the business and property affairs of Mrs. Langmeier were effectively transferred to the guardian of her property. Thereafter comes the development which, to me, is the most shocking of the whole affair and which, I am very sorry to say, provides an unpleasant taint to the entire case.

## V.

The development, of course, was the execution of the new will by Mrs. Langmeier on August 13, 1981. But it is not the fact that this event occurred that is disturbing. Rather, it is the manner and the circumstances under which it came about that provides the appropriate degree of incredulity.

To begin with, despite the fact that a guardian had been appointed for the property of Mrs. Langmeier only two weeks earlier, and despite the fact that the guardianship petition had been prompted because of the fear on the part of certain of the Missouri relatives that Mrs. Langmeier was in danger of being taken advantage of financially, specifically by Marlene Holland, it is undisputed that the execution of the new will by Mrs. Langmeier, leaving almost her entire estate to Marlene Holland, was accomplished without any prior notice to either the guardian or to counsel for the guardian and Mrs. Frenzel. And this was so despite the fact that Judge Gallo had a

lengthy telephone conversation with counsel for the guardian and Mrs. Frenzel on August 13 only a few hours before the execution of the will.

Moreover, the secretive effort did not stop with the execution of the will. On the contrary, the attempt was also made to have Mrs. Langmeier execute two other legal documents at the same time. One of these was an employment agreement, the effect of which was to have Mrs. Langmeier hire Marlene Holland as her permanent housekeeper at a salary of $400 per week for the duration of Mrs. Langmeier's life, with the accompanying understanding that Marlene Holland could live in Mrs. Langmeier's home for as long as Mrs. Langmeier was alive, whether or not Mrs. Langmeier was actually living in the house herself. The other legal document was an application to be filed with the appropriate court whereby Mrs. Langmeier was to adopt Marlene Holland as her daughter!

The signing ceremony was convened at the home of Mrs. Langmeier. In attendance were Marlene Holland (although she apparently remained in another room while the will and the employment agreement were being explained and executed), Judge Gallo, an attorney from Judge Gallo's office who acted as a notary, Dr. Weintraub, Anthony G. Flynn, an attorney retained to represent Marlene Holland (he had prepared the employment agreement and the adoption papers the day before), and Judson Ryon, a longtime personal friend of Judge Gallo who, at the request of Judge Gallo, had previously outfitted Mrs. Langmeier with a hearing aid for the occasion.

The signing ceremony covered the better part of an hour. Judge Gallo went over the terms of the will, apparently in the "slow supportive" manner found by Dr. Weintraub to be necessary for Mrs. Langmeier to understand such complex matters. He also read the employment agreement to her. It is established by the evidence that Mrs. Langmeier said virtually nothing during this entire procedure. She simply said "yes" or "no" or nodded her head one way

or the other. She signed her will and it was co-signed by Ryon and Dr. Weintraub as witnesses. She signed the employment agreement. However, by the time that she got to the adoption papers, she twice missed the signature line in attempting to sign them. According to Flynn, she was obviously tired. Judge Gallo suggested that the adoption papers should await another day. They were never signed.

The will executed by Alice Langmeier on August 13, 1981, left her entire estate of more than $1 million to Marlene Holland, with the exception of a $25,000 bequest to her chauffeur of many years.

## VI.

On August 18, 1981, five days after the execution of her new will, Alice Langmeier fell during the early morning hours and broke her hip and her arm. This event, too, had unusual implications. Upon discovering the fallen Mrs. Langmeier, Marlene Holland did not immediately call for medical assistance. She says that she did, but on the evidence I am convinced that she did not. Rather, she called Mrs. Langmeier's chauffeur who, after arriving from his home and surveying the situation, directed Ms. Holland to call an ambulance. (Interestingly, Marlene Holland did not accompany the ambulance to the hospital.)

Marlene Holland says that prior to the arrival of the chauffeur and the ambulance Mrs. Langmeier told her that there was a signed check in the nightstand and that Marlene should use it so as to have money while she was in the hospital. Marlene Holland cashed the check that same morning for the sum of $500. Yet when Mrs. Langmeier was admitted to the hospital a short time after this alleged conversation, Dr. Paul Montigney, the physician who examined and treated her during her subsequent hospitalization, found her to be in an acute state of confusion and unable to give sensible answers to his questions. Likewise, Dr. John Hogan, the orthopedic surgeon who repaired her broken hip and arm on

that same day, found her to be unaware of where she was or how she got there.

From his treatment of her it was the opinion of Dr. Montigney that Mrs. Langmeier suffered from senile dementia, or organic brain damage, in that she showed a deficit of intellectual function and orientation, that she lacked the ability to make a judgment and that her memory was not good. Both he and Dr. Hogan were of the opinion that the persistent confusion displayed by Mrs. Langmeier following her fall was ongoing and was not of the type that could have been produced by the trauma of the fall itself.

At trial, it was the stated opinion of both Dr. Montigney and Dr. Hogan, based upon their examination and contact with Mrs. Langmeier on August 18, 1981 and thereafter as well as upon the report of Dr. Hayes, and the opinion of Dr. Hayes, based upon his examination of her on June 26, 1981, that as a matter of reasonable medical probability Mrs. Langmeier did not possess the necessary elements of testamentary capacity on August 13, 1981. In reaching these conclusions all three physicians focused on her physical and mental condition when weighed against her ability to make a complex judgment, her ability to comprehend that she was making a will, her ability to know the extent of the property that she had available to give away, and the ability to formulate a rational plan for the disposition of her property.

The caveator also called as a rebuttal witness Dr. Philip Mechanick, a full professor at the University of Pennsylvania School of Medicine and the Director of Clinical Services for the Department of Psychiatry at that university. Dr. Mechanick based his evaluation of Mrs. Langmeier's testamentary capacity on the written reports of Dr. Hayes and Dr. Montigney and the trial testimony of Dr. Weintraub. As a qualified expert, he too concluded as a matter of reasonable medical probability that Alice Langmeier would have lacked the testamentary capacity to make a will on August 13, 1981.

Moreover, Dr. Mechanick, as one certified in psychiatry himself, downplayed the thought of determining testamentary capacity from nothing more than the four standard psychological tests employed by Dr. Weintraub. He viewed it to be imperative to gain some insight as to the proposed testamentary plan, the person's knowledge of his property, his ability to recognize natural objects of his bounty, etc. Dr. Mechanick was also troubled by Dr. Weintraub's theory of "supportive assistance" from another since it could well give rise to an issue of undue influence depending upon who was providing the support. In short, Dr. Mechanick viewed Dr. Weintraub's evaluation to be too shallow, and thus inconclusive.

Various other witnesses were called by both sides on the question of whether or not Mrs. Langmeier had a problem with alcohol. (I find the evidence on this question to be inconclusive, one way or the other.) There was also evidence that upon her hospitalization after her fall on August 18, 1981, Mrs. Langmeier never asked for Marlene Holland nor mentioned her name, and that she expressed some remorse upon being told that she had executed a new will, an event as to which she apparently had no recollection. However, given the unassailed medical testimony as to her confused mental condition during this period, I am not inclined to go into her precise verbalizations in any detail.

In short, there are numerous other factual matters which could be covered based upon the evidence presented, but I feel that the foregoing, when taken in conjunction with the various testimonial conflicts referred to hereafter, will be sufficient for present purposes. The questions at this point may be stated as follows: (1) Has the caveator established on all of the evidence that Alice Langmeier lacked the legal capacity to make a will on August 13, 1981? (2) Has the caveator established on the evidence that the will of August 13, 1981, was the product of undue influence inflicted

upon the testatrix by and on behalf of Marlene Holland, the proponent of the will?

At first glance one might think that the task of answering these questions would be an easy one. An 85-year-old woman purporting to leave an estate of more than $1 million to a person she had known for only some four months. A woman who was obviously suffering from a degree of senility and judgmental impairment brought about by organic brain damage. A will and an employment contract executed in secrecy and without notice to the guardian of her property only two weeks after it had been established by the record in this Court that the appointment of a guardian was appropriate because of her inability to properly manage and care for her property. A will brought about in large part through the efforts of a person standing in a confidential relationship to the testatrix who also became the primary beneficiary under the terms of the instrument. And yet it is not quite that simple.

I cannot be unmindful of the fact that as of the time that Marlene Holland arrived on the scene Alice Langmeier was a woman nearing the end of her life who was basically alone in the world. On the evidence it appears that she had no close friends and that she had had none for some time. She had no acknowledged next of kin of her own, and the Missouri relatives of her deceased husband—which is all that she had remotely resembling family members— were many hundreds of miles away. Her sight and hearing were defective. Her opportunities for enjoyment were few. She shared her home with professional companions who, although kind and comforting to her, were there because it was their job and not because of their personal feeling for Mrs. Langmeier. It was into this setting that Marlene Holland came.

Marlene Holland, too, is not without her sympathetic side. She is a woman in her mid-forties who has suffered considerable personal misfortune. She has experienced two unsuccessful marriages, the second of which led her to a problem with alcohol which, in turn, resulted in a period of institutionalization. She was not well at the time that she met Mrs. Langmeier. During the late 1970's she underwent surgery on three separate occasions for cancer. She has cancer now. She, too, was apparently alone in the world. Although in poor health, she was working as a live-in companion for others apparently as a means for survival.

There appears to be no question on the evidence that Mrs. Langmeier immediately took to Marlene Holland. There seems to be no question as to her genuine fondness for her during the early months of their relationship. In her last days she had found a close friend who was willing to share her life on a round-the-clock basis. Who is to say that under such circumstances wealth and fortune cannot assume a secondary role to the comfort derived from knowing that in your last days there is someone who truly seems to care?

On the evidence it would seem that in her last days Mrs. Langmeier was never fully cognizant of the exact size of her estate anyway. With no immediate family and with nothing to do with her estate except to leave it to charity, it is conceivable that one in Mrs. Langmeier's position could have sincerely intended to leave all that she had to the down-on-her-luck person who was kind enough to befriend her when she had no one else. If viewed in this manner the enormity of the bequest when measured against the brevity of the relationship can be seen in a different and less nefarious light.

Then, too, there is the participation of Judge Gallo in the matter. He is a man in his seventies and no doubt he was able to relate to one in the position of Mrs. Langmeier. He has been a practicing attorney for more than 50 years and it must be assumed that he has some familiarity with the legal concepts of testamentary capacity and undue influence. He took the precaution of having his client examined before permitting her to execute the new will, and he had at least one opinion that she was competent to do so. He states that he

never had any question as to her mental ability, and that she was always alert and responsive in his discussions with her. He says that this was true on August 13, 1981, when she executed her will.

It was Judge Gallo's testimony that Mrs. Langmeier wanted to draw a new will in favor of Marlene Holland because Marlene was the only one who had shown her any love and attention over the preceding months. He takes the position that the guardianship proceedings cast no doubt on the competency of Mrs. Langmeier since the appointment of the guardian came about as a result of the agreement and stipulation of counsel based upon what was best for Mrs. Langmeier and not as a result of any evidentiary finding by the Court that she was incapable of dealing with her assets. Because of this he felt it unnecessary to advise the guardian or opposing counsel of the plan to have her execute the new will because he viewed it to be none of their business.

There is also the testimony of Mrs. Langmeier's part-time gardener. He had been the gardener of Arthur and Alice Langmeier for years. After Arthur Langmeier's death he visited with Alice at least twice each month. He visited with her on August 15, 1981, three days before her fall and two days after she signed her new will. He verified that Alice liked Marlene Holland and that she was a much happier person after Marlene came to live with her on a full-time basis. As far as he was concerned there was no question at any time about the competency of Mrs. Langmeier.

Finally, there was Frank Bolden, the chauffeur. Bolden had worked for almost 40 years as the chauffeur and valet for Arthur Langmeier prior to his death. He stayed on as chauffeur for Mrs. Langmeier and, next to Marlene Holland, he is the person who probably had the most contact with Mrs. Langmeier during the months preceding the execution of her new will. From his observation of the situation he was convinced that Mrs. Langmeier was fond of Marlene. It was also his testimony

that Marlene Holland never gave Alice orders, but rather that Alice was always the boss.

In short, the matter is hardly one-sided. At the same time there are certain inconsistencies in the testimony and the documentary evidence which, when viewed overall, lead me to the conclusion that the caveat must be upheld. I catalogue them as follows.

For one thing, the credibility of Marlene Holland as a witness is clearly critical. Only she and Alice Langmeier could know what truly went on between them, and Alice Langmeier's lips are sealed. It was Marlene Holland's testimony that the entire idea for the new will, the various cash gifts, the employment agreement and the adoption was that of Mrs. Langmeier. If she is to be believed, then the case of the caveator is weakened severely.

In this regard, however, it must be noted that Marlene Holland concedes that she lied on her job application to Quality Care. She stated that her last previous job had been caring for an elderly woman who had died. This was not true. She had never cared for the woman named and the woman had been dead for more than 20 years. She admits doing this so as to make her work record look more impressive. She says that she falsified her application because she needed the job.

Ms. Holland is forced to concede also that she lied to the Quality Care representatives when she was first asked about and denied receiving gifts from Mrs. Langmeier. Moreover, after Mrs. Langmeier had been hospitalized as a result of her fall, Marlene Holland informed the gardener that she had known nothing of the new will until after it was executed.

As to contrasts with the testimony of her own witnesses, Ms. Holland testified that she hired Mr. Flynn as her attorney on June 16, 1981. Mr. Flynn states that he was retained on July 24, 1981, after the guardianship proceedings were instituted, and that he was called by Mr. Linarducci from

Judge Gallo's office and asked to represent her. Ms. Holland says that she did not give Flynn the information for the employment agreement and the adoption papers, but rather that the details for those documents came from Flynn's discussions with Mrs. Langmeier. Flynn testified that he never discussed these documents with Mrs. Langmeier and that the necessary information came from Marlene Holland.

Ms. Holland takes the position that she never considered Judge Gallo to be her attorney. Yet it was the testimony of Lewis Hyman, the Wilmington Trust Company representative, that Ms. Holland telephoned him on June 15, 1981, and advised that she was having Gallo, her attorney, prepare a new will for Mrs. Langmeier and that she would have him and Frank Bolden, the chauffeur, included as beneficiaries. Dr. Hayes also understood her to say that her attorney, Judge Gallo, was preparing a will for Mrs. Langmeier. Moreover, the office records of Judge Gallo reflect ten separate calls to Marlene Holland during the critical time period.

The office records of Judge Gallo also provide another disturbing inconsistency. According to Marlene Holland and Judge Gallo, the triggering event which directly gave rise to the decision of Mrs. Langmeier to seek a lawyer for the purpose of changing her will was a visit of Mr. Hyman to Mrs. Langmeier at her home. Mr. Hyman had brought papers for her to sign for the purpose of transferring a major portion of her checking account funds into the trust accounts managed for her by Wilmington Trust Company. His decision to take this protective action had been prompted by Marlene's call of the day before. Mr. Hyman also said certain things concerning the Missouri relatives which allegedly upset Mrs. Langmeier. There is no question but that the date of this event was June 16, 1981. Allegedly, the initial phone call to Judge Gallo was made by Mrs. Langmeier and Marlene Holland shortly after Hyman's departure.

Judge Gallo positively denies that he gave either Ms. Holland or Mrs. Langmeier any advice concerning a will or the need for a medical examination prior to the date of the phone call following this disrupting visit by Mr. Hyman. However, in the affidavit filed by Judge Gallo in support of his fee application in the guardianship proceedings there are reflected two telephone calls from Mrs. Langmeier to him, and one from him to her, on June 11, 1981. The affidavit further indicates a call from him to her on June 15, 1981. And it is not to be forgotten that the initial examination of Mrs. Langmeier, at the request of Marlene Holland and Judge Gallo, occurred on June 15, 1981.

Also, Dr. Weintraub indicated that he met with Judge Gallo at Mrs. Langmeier's home on August 6, 1981, and observed her while Judge Gallo was going over the contents of the will that he was preparing for her. Judge Gallo disputes this. He denies that either the will or the contents were discussed on that date. He says Dr. Weintraub is wrong in his recollection.

At trial Judge Gallo testified that he explained the requirements of Delaware law concerning testamentary capacity to Dr. Weintraub over the telephone. Dr. Weintraub, of course, testified that he did not know them even at the time of the trial. At his pre-trial deposition Judge Gallo stated that he assumed that Weintraub knew the requirements since he had been around for thirty years.

Finally with regard to Judge Gallo, it was his testimony that on August 13, 1981, after he had gone over the will with Mrs. Langmeier and explained it to her, he and everyone else except Dr. Weintraub left the room while Dr. Weintraub also went over the will with her in private. He says that they all returned to the room for the signing of the will after Dr. Weintraub called them back and pronounced Mrs. Langmeier to be all right. Dr. Weintraub's recollection is quite different. He states that he has never examined the provisions of the will and that at no time did he review the terms of the

will in private with Mrs. Langmeier on August 13, 1981.

As to Judson Ryon, the other witness to the will, he states that he was unaware that he was being called upon to witness a will on August 13, 1981, until after his arrival at Mrs. Langmeier's house. As the supplier of her hearing aid, he thought the purpose of his presence was to make sure that she could hear. He says that by signing the will he meant to indicate only that she had signed the instrument in his presence. He admits that he cannot offer an opinion as to the competency of Mrs. Langmeier to make a will on that date. He paid no attention to her in that regard. He saw that Dr. Weintraub was there so he figured everything must be all right.

Finally, there is the testimony of Mr. Linarducci. As noted previously, he was assigned the task of representing Mrs. Langmeier in the guardianship proceeding. By way of preparation he visited with her on July 9 and July 16, 1981. On his first visit he was concerned about her competency. At the time her condition appeared to be such that he would not have wanted to put her on the witness stand in opposition to the petition.

After his second visit, however, he concluded that he would have had no hesitation in calling her. On that occasion she seemed rested and more responsive. From this he concluded that some days were better than others for her. Significantly, however, Mrs. Langmeier indicated to him at the July 16 meeting that she wanted to leave Marlene Holland $25,000 in her will. She said that was enough because Marlene had only been with her for a few months. She also wanted to leave Frank Bolden $25,000. (Mr. Linarducci had nothing to do with the drafting of the will or the employment contract and he did not see them until after Mrs. Langmeier's death. He did not participate in the execution of these documents on August 13, 1981.)

Based upon these factors I am forced to conclude that the testimony of Marlene Holland cannot be accepted as credible in all respects. I am forced to conclude further that there is a lack of consistency in the evidence offered on behalf of the proponent of the will on the issue of the testamentary capacity of Mrs. Langmeier on August 13, 1981 as well as on the issue of whether the decision to leave almost her entire estate to Marlene Holland was a product of her own free will. When this is coupled with the affirmative evidence offered by the caveator, I find it sufficient to conclude that the caveator has carried its burden in this matter.

The sticky aspect of this case is, of course, attributable to the legal requirement that the party carrying the burden of proving incapacity and undue influence—the caveator here—must show by a preponderance of the evidence that the disability existed at the very time that the will was executed. On this point there were six persons who were either present when Mrs. Langmeier actually signed her will on August 13, 1981, or who were in her presence both immediately before and immediately after she signed the will on that date. Judge Gallo, the attorney from his office who notarized the document, Dr. Weintraub and Judson Ryon fall into the first category. Marlene Holland and her attorney, Mr. Flynn, are in the second. All but the notarizing attorney (he was not called as a witness) have testified in favor of admitting the will to probate. No one from the caveator's side of the matter was in attendance, and therefore the caveator cannot directly counter this testimony.

At the same time this factor is not necessarily determinative for it is clear that circumstantial evidence bearing on the state of mind of a testator at the critical time may also be considered. As stated in *Steele v. Helm,* Del.Super., 43 A. 153, 154 (1896):

"The state or condition of a person's mind at the time is a fact to be proved like any other fact in the case; and, in order to ascertain this, evidence is admissible to show the state of his mind both before and after the execution of said will. Accordingly, either the existence or want of

testamentary capacity, or the exercise of undue influence, may be proven by both direct and circumstantial evidence. But whether such evidence relate to the state of the testator's mind and situation before, at, or after the making of his contested will, yet, to be material, it must tend to show his testamentary capacity or incapacity, and his free or controlled will, at the very time when said instrument was executed; for that is the essential and precise fact to be determined."

Circumstantial evidence is the proof of one fact by proving the existence of certain other facts. *Cecil v. Mundy,* Del. Super., 92 A. 850 (1914). It is where some facts being proved, another fact, the fact in issue, follows as a natural or very probable conclusion from the facts actually proven. It is an inference of fact from other facts proved. *Fahey v. Niles,* Del.Super., 108 A. 135 (1918). Circumstantial evidence can have probative value equal to that of direct, or testimonial, evidence. *Lukon v. Pennsylvania R. Co.,* 131 F.2d 327 (3rd Cir.1942); *Wigmore on Evidence* (3rd Ed.) § 26. Thus, the fact that only the proponent of the will has offered direct evidence as to the condition of the testatrix at the execution of the will on August 13, 1981, is not controlling of the issues to be decided.

Other long-established will contest rules which apply to weighing the evidence in this matter may be summarized as follows. First of all, evidence as to the physical and mental condition of the testatrix, both before and after the execution of the will, is admissible on the issue of the condition of the testatrix at the time of the execution of the will. *Rodney v. Burton,* Del.Super., 86 A. 826 (1912); *Pritchard v. Henderson,* Del.Super., 50 A. 217 (1901). Since medical men, properly qualified, are more competent to form an opinion as to testamentary capacity than are lay witnesses, greater weight will, in general, be given to their opinion than to the opinion of non-medical witnesses. *Rodney v. Burton, supra.*

The subscribing witnesses to a will, being placed by the law around the testator at the time of the execution of his will for the special purpose, among others, of ascertaining and judging his capacity, are permitted to testify as to the opinion they formed at the time as to whether his mind appeared to be sound or unsound, and, if they are established to be persons of intelligence and veracity, their opinions are entitled to great weight. *Rodney v. Burton, supra; Ethridge v. Bennett's Executors, supra.*

At the same time, the value of the opinion of a subscribing witness depends upon his opportunity to observe and judge a testator's mental condition and capacity, and upon the use made of that opportunity. If it appears that he did not have, or having, did not use his opportunity for observation, then the special value of his opinion ceases, because the peculiar weight given by law to such testimony arises from the opportunity of the witness for observation and the probability of his using the opportunity on account of his participation in the transaction. *In re Miller's Will, supra.*

Testamentary capacity in this jurisdiction has been defined to mean that one who makes a will must, at the time of execution, be capable of exercising thought, reflection and judgment, and must know what he is doing and how he is disposing of his property. He must have sufficient memory and understanding to comprehend the nature and character of his act. *In re Estate of Bandurski,* Del.Ch., 281 A.2d 621 (1971); *Rodney v. Burton, supra; Pritchard v. Henderson, supra.* Was the person able to understand that he is disposing of his estate by will, and to whom he is disposing of it? *In re Miller's Will, supra; Smith v. Day, supra.* Was he capable of recollecting what property he was disposing of and and to whom he was leaving it? *Steele v. Helm, supra.* If so, the will is valid regardless of whether or not the dispository scheme might seem improvident to others and regardless of the mental condition of the tes-

tator at times either prior or subsequent to the execution of the will.

■■■■ On the matter of undue influence our law is also well established. Undue influence is an excessive or inordinate influence considering the circumstances of the particular case. The degree of influence to be exerted over the mind of the testator, in order to be regarded as undue, must be such as to subjugate his mind to the will of another, to overcome his free agency and independent volition, and to impel him to make a will that speaks the mind of another and not his own. It is immaterial how this is done, whether by solicitation, importunity, flattery, putting in fear or in some other manner. Whatever the means employed, however, the undue influence must have been in operation upon the mind of the testator at the time of the execution of the will. The essentials of undue influence are a susceptible testator, the opportunity to exert influence, a disposition to do so for an improper purpose, the actual exertion of such influence, and a result demonstrating its effect. *Nardo v. Nardo, supra; Conner v. Brown,* Del.Super., 3 A.2d 64 (1938).

Applying these standards to the evidence of this case I am satisfied that the caveator has proven both that Alice Langmeier lacked the necessary capacity to execute a will on August 13, 1981, and that the will was the product of undue influence exerted upon her as that term is used in the law.

■■■ As to testamentary capacity, the caveator has offered the expert opinion of three expert medical witnesses, one of whom examined her six weeks prior to the making of the will and two who treated and examined her five days thereafter. The qualifications of these experts to offer such an opinion are not in doubt. All agreed as a matter of reasonable medical probability that on August 13, 1981, Alice Langmeier lacked the capacity to make a complex judgment, lacked the ability to understand that she was making a will, and lacked the ability to formulate a rational plan for the disposition of her property. By way of

opposing medical opinion, we have only the testimony of Dr. Weintraub and, although he was retained specifically to pass upon her capacity, he admittedly asked her no questions designed to elicit her knowledge as to the nature and extent of her property, her awareness of the natural objects of her bounty, her intended testamentary plan or the reason why she was making a new will. As close as he came to the subject was asking Mrs. Langmeier if she knew why Judge Gallo had sent her to him to be examined. According to Dr. Weintraub, her answer was that she did not know. Moreover, he at no time observed her thereafter in light of the legal requirements for testamentary capacity under Delaware law. This is for the simple reason that he was unaware of them.

There is the opinion of L. Kent Wyatt, the attorney called in by Dr. Hayes to assist him in his examination. Mr. Wyatt concluded on June 26 that Mrs. Langmeier lacked testamentary capacity. In response to his questions on that date she could not respond intelligently about her property— she thought she owned a house and a car but could not recall anything else—and she did not understand the concept of a trust or trustee. Also on that date she could not remember her housekeeper's name even though Marlene Holland had brought her to Dr. Hayes's office and was waiting in an outer room at the time.

From the record I can find no convincing evidence that Mrs. Langmeier ever fully knew or appreciated during the summer of 1981 the size of the estate which she had available to her for disposition. This is highlighted by an event which took place at the signing ceremony on August 13. Immediately after she had signed her will she was presented with the employment agreement. Upon learning that it called for a payment of $400 per week to Marlene Holland, she turned to Judge Gallo and asked if she could afford it. She signed the document only after he assured her that she had plenty of money.

There is also another significant event which took place on August 13, although not previously mentioned. At the time of the appointment of a property guardian for Mrs. Langmeier on July 30, 1981, the guardian was directed by the Court order to retain Thomas Posatko, the former Public Guardian for the State of Delaware, for the purpose of making regular visits to Mrs. Langmeier so as to monitor her health and personal needs. Mr. Posatko was to provide periodic evaluations of her continuing situation to the guardian and the Court. To that end, Mr. Posatko met with Mrs. Langmeier on or about August 7 so as to introduce himself to her and to explain his role. Their meeting was apparently a cordial one. (Mr. Flynn was also present at this meeting, presumably to protect the interests of Ms. Holland.)

On the morning of August 13, only a few days later, Mr. Posatko—unaware of the will signing scheduled for that afternoon—visited Mrs. Langmeier. His primary purpose was to read to her a letter that she had been sent by one of the Missouri relatives. Despite his visit of only a few days earlier, Mrs. Langmeier did not know who he was and gave no real indication of knowing him throughout the entire course of that visit. Rather, she thought him to be one of Arthur Langmeier's relatives from Missouri. This, of course, was only a few hours before she executed the will in issue.

As to those on behalf of the proponent who were in attendance at the signing ceremony in Mrs. Langmeier's home on August 13, I make the following observations. Marlene Holland is definitely a party interested in the outcome of this litigation, and, for the reasons previously given as well as for others not enumerated, her credibility as a witness is subject to serious doubt. The attorney in Judge Gallo's office who

notarized the self-proving will was not called to testify. Judge Gallo's testimony, unfortunately, conflicts with the testimony given by others on his side of the matter to such a substantial degree that it necessarily casts suspicion as to the accuracy of his recollection of the events.[1] Mr. Flynn was not present in the room when the will was allegedly explained and executed. Thus he can say nothing as to the condition and apparent understanding and responsiveness of Mrs. Langmeier at the critical time. He has established, however, that within a very few minutes after the will was executed her condition was such that she could not even sign her name on a signature line. That, of course, leaves only the testimony and opinion of Judson Ryon and Dr. Weintraub as the subscribing witnesses.

Dr. Weintraub's participation has been discussed previously. I have no doubt that he was sincere in his view that Mrs. Langmeier was capable of making a will provided that it was explained slowly to her with appropriate supportive assistance. I have no doubt that he viewed her to be all right on August 13 when she signed the document. I think that he is the best witness on the subject that the proponent has. However, I cannot fail to note that on August 13, according to his testimony (and contrary to the recollection of Judge Gallo), he conducted no personal interview or examination of Mrs. Langmeier to reaffirm the opinion established by his previous examination and observation of her, and he was assured that she understood and agreed with everything that Judge Gallo was saying to her primarily because she asked no questions and made no objections.

Finally, there is Judson Ryon. He testified that he saw nothing wrong with Mrs. Langmeier on August 13. At the same time he was candid in his testimony that he

---

1. Another noteworthy discrepancy deals with the executrix named in the August 13 will. The person named was Mary Gallo, Judge Gallo's wife. According to Judge Gallo this was Mrs. Langmeier's idea. According to him, it was Mrs. Langmeier who on her own suggested that Mrs. Gallo be named executrix because of all the wonderful things she had heard about Mrs. Gallo and because of her excellent reputation in the legal community for handling estates. In view of Marlene Holland's close involvement in the matter, it is difficult to reconcile this with her testimony that she had no idea why Mrs. Gallo was selected as the executrix.

paid virtually no attention to Mrs. Langmeier while the will was being explained to her. He assumed that his function as a subscribing witness was simply to verify her signature on the document. In fact, he went to the far side of the room so as to be out of the way while Judge Gallo was performing his task. He considered this to be the discrete thing to do since he considered that whatever was going on between Judge Gallo and his client was none of his business. As he stated at trial:

"I got over by the doorway where I wouldn't hear them, because I didn't think it interested me in the least. I didn't think I was brought there for that.

"Q. Do you think you were qualified to express an opinion on Mrs. Langmeier's mental competence at all?

"A. No, sir.

"Q. On August 13?

"A. I am not qualified for that."

Mr. Ryon further conceded that he would not "be a person to judge" the capacity of Mrs. Langmeier on August 13 to sign légal documents. Consequently, by his own testimony, the value that normally would be accorded to Judson Ryon as a subscribing witness is rendered virtually nil.

 Where the Court is sitting as trier of the facts it must determine where the preponderance of the evidence lies on a particular issue and, correspondingly, it is the Court that must determine the weight to be given to the testimony. The rule is that in determining the weight and the credibility of the testimony, the apparent fairness, interest or bias of the witnesses, their opportunity to see and know of the circumstances, their recollections connected therewith, and all other facts and circumstances that go to test the accuracy of their testimony, are to be considered. *Benson v. Wilmington City Ry. Co.,* Del.Super., 75 A. 793 (1910). *In re Miller's Will, supra.*

Applying this rule to the evidence presented in this matter I am convinced that the caveator has established by a preponderance of the evidence that Alice Langmeier lacked the testamentary capacity to make a will on August 13, 1981.

On the undue influence issue, I think the circumstantial evidence offered by the caveator is equally convincing. As noted previously, the appearance of Marlene Holland into Mrs. Langmeier's life resulted in numerous things which indicated a susceptible testatrix and an assertion of influence over her by Marlene Holland. There were the cash gifts to Ms. Holland totaling more than $9,000, most of which were by means of checks signed and negotiated by Ms. Holland. There was the $5,000 check taken out of sequence by Ms. Holland from the back of the checkbook when it was learned that one of the Missouri relatives was coming to visit. There was no apparent need for this and no explanation has been offered. One logical inference might be that it was motivated by a fear on the part of Ms. Holland that her position of influence over Mrs. Langmeier might become jeopardized if others discovered what was going on.

There was the gradual elimination of all contact by Mrs. Langmeier with her neighbor and her few social acquaintances. There was the cessation of her pattern of phone calls and contacts with the Missouri relatives. And there was also the cashing of the Series H bonds and the alleged gift of the $34,500 proceeds to Ms. Holland. It is clear from the bank officials who participated in this transaction that Marlene Holland and Mrs. Langmeier came to the bank on two occasions, once to cash in the bonds and once to pick up the proceeds, and that on each occasion Marlene Holland did all of the talking, explaining what it was that Mrs. Langmeier wanted to do and giving assurance that she fully understood the procedure and consequences. Mrs. Langmeier verbalized nothing on either occasion despite the efforts of the bank representatives to communicate directly with her.

 I think, however, that it is the employment agreement which dispels all doubt on the undue influence issue. I think that this is where things went too far. The

guardianship of Mrs. Langmeier's property was established so as to protect her against designing persons, among other things. That is the purpose of the statute which authorizes such action.[2] In other words, Delaware Trust Company was appointed guardian for the express purpose, among others, of overseeing the expenditure of Mrs. Langmeier's money and to protect her against entering into improvident business relationships with those who, because of her age and condition, might try to take advantage of her. To this end, Delaware Trust Company entered into an arrangement with Marlene Holland to pay her a periodic sum to stay on as housekeeper and companion.

Despite this, Ms. Holland then set about to get herself a new and better deal by going directly to Mrs. Langmeier without the knowledge of Delaware Trust Company. She supplied the details of what she wanted to Mr. Flynn. She had Mr. Flynn, her attorney, draft the agreement. That is his testimony and under the circumstances I have no reason to doubt it.

The employment agreement was not drafted until the day before it and the will were signed. It was not presented to Mrs. Langmeier until that date and Judge Gallo, Mrs. Langmeier's attorney, had never seen it until Flynn produced it at Mrs. Langmeier's home on August 13. That Mrs. Langmeier likely knew little of its content is illustrated by her inquiry to Judge Gallo as to whether or not she could afford $400 per week. This hardly indicates a predisposition to pay Marlene Holland that amount of her own volition.

Yet the employment agreement was presented to Mrs. Langmeier along with the will which left her estate of more than $1 million to Marlene Holland. They were offered as a package. Under the circumstances, with the lawyer recommended for her by Ms. Holland present, with Ms. Holland's lawyer present, and in the presence of the doctor and witnesses produced by her lawyer, Mrs. Langmeier signed the employment agreement which was clearly against her interests and of which, I am convinced, she had no knowledge or understanding prior to the time it was presented to her. Yet she signed it without question upon being assured that she could afford it.

I think, given the existence of the guardianship and Ms. Holland's knowledge of it, that this clearly indicates a disposition on the part of Marlene Holland to take advantage of her confidential relationship with Mrs. Langmeier and to exercise her influence over her for an improper purpose and, further, that it shows the actual exertion of such influence and a result demonstrating the effect. In short, she had to know better. When taken together with all other factors mentioned herein, I think it is equally inferable that the accompanying presentation and execution of the will was the result of the same influence.

That this is so with regard to the will is further substantiated by the testimony of Mr. Linarducci concerning his meeting with Mrs. Langmeier on July 16, 1981. On that occasion she appeared, in his view, to be alert, well rested, and competent to give testimony in court. Yet he was told by Mrs. Langmeier on that occasion that she wanted to leave Marlene Holland $25,000 in her will because she had not been with her that long.

**2.** The statute, 12 *Del.C.* § 3914, is also jurisdictional. There is no inherent power in a court of equity to appoint guardians for aged and infirm persons. The power derives solely from statute and is limited thereby. *In re Markel,* Del. Supr., 254 A.2d 236 (1969). Correspondingly, this Court has no power to appoint a guardian unless the record before it supports a conclusion that because of age or infirmity a person is unable to properly manage his property and is thereby in danger of losing it or becoming the victim of designing persons. In this case, the facts alleged in the verified petition and the supporting affidavit of Dr. Hayes, when coupled with the stipulated consent of her attorney, constitute a sufficient record to support the conclusion that Alice Langmeier was incapable of handling her property. The order of the Court entered on that record obviously constituted a finding of her incapacity even though no evidentiary hearing was held.

In short, I am convinced that the employment agreement clearly spoke the mind of Marlene Holland and not that of Alice Langmeier. Coming as it did, I think that it clearly shows that on August 13, 1981, Alice Langmeier was subject to the control and influence of her new-found friend and that Marlene Holland improperly utilized her position of influence for her own gain, security and protection. When this is taken in conjunction with all the other indications of the subjugation of the will of Mrs. Langmeier to that of Marlene Holland, however innocently the initial relationship between the two women may have developed and regardless of any genuine affection that may have existed between the two, I think that the evidence is sufficient to show by a clear preponderance that the will of Alice Langmeier of August 13, 1981, was also the product of undue influence. Therefore, I find that judgment must be entered in favor of the caveator on this issue as well as on the issue of testamentary capacity.

By way of a postscript, I cannot help but view the situation presented by this case to be a sad one. Alice Langmeier was apparently a refined, educated and dignified lady who, until her final months, had led a dignified life. The ending somehow, does not seem deserved. Old and virtually alone in her 85th year, she met someone who apparently gave her great comfort and who, in turn, she was in a position to help. It should have ended better. There should have been something more than the onslaught of medical examinations, lawyers and bankers racing to and fro in an effort to protect or redirect her wealth, the loss of contact with what few acquaintances and distant relatives she had, litigation, hospitalization and, finally, the taking of her deposition shortly before her death, a deposition which revealed at the time a wounded and pathetic figure who, despite her best efforts to respond intelligently to questions, was virtually incoherent. But such unfortunate situations have been with the civilized world since time immemorial, and undoubtedly there will be more to come.

Finally, it would be an injustice not to compliment counsel on the manner in which this case was tried and presented. It was an exceedingly professional job on both sides. In *Ethridge v. Bennett's Executors, supra,* also a will contest case, the trial judge commenced his charge to the jury with the following statement as found at 31 A. 814:

> "And I must say, gentlemen, that of all the cases which I have ever heard tried,— and they have not been few,—I have never heard one more ably tried, better tried, or in which the manner of counsel was more pleasant, not only towards each other, but towards the court, as in this case; and it has been a matter of great satisfaction and of great pleasure to the court. We say to you, gentlemen, that each of the counsel in the trial of this case has discharged his duty fully and clearly."

That sentiment I echo in this matter.

The caveat of Wilmington Trust Company is upheld. The will of Alice Langmeier of August 13, 1981, shall be denied admission to probate. The prior will of Alice Langmeier dated May 4, 1978 shall, upon proper proof, be admitted to probate as her last will and testament. An appropriate form of order may be submitted.