**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |  |
|---|---|---|
| IMO The Estate of Aldon S. Hall | ) ) ) | C.A. No. 8122-MA |

**MASTER'S REPORT**

Date Submitted: May 23, 2014
Draft Report: September 22, 2014
Final Report: October 2, 2014

This is an estate dispute between the three adult children and second wife of Aldon S. Hall ("Mr. Hall" or "the decedent"), who died on January 21, 2012. Petitioners Anthony Hall, Felicia Lake, and Aaron Hall are the decedent's children, and Respondent Catherine Taylor Hall, is the decedent's second wife. Decedent's Last Will and Testament was executed in 1976, long before his second marriage, which occurred on January 1, 2008. In his will, decedent left his entire estate to Anthony,[1] expressing the confidence that Anthony would provide adequately for decedent's other children. However, after decedent's death, his children discovered that the bulk of their father's real and personal property, valued at nearly $600,000.00, was held by the entireties or jointly with his second wife, leaving them almost nothing. The children now have taken exception to the First and Final Accounting filed by Catherine, claiming that the transfers of real

property to Catherine and the creation of joint accounts were the product of Catherine's undue influence or, in the alternative, that the joint bank accounts were intended to be convenience accounts.

## Procedural History

This matter began on December 19, 2012, when petitioners filed a Demand for Bond under 12 *Del. C.* § 1524, alleging that respondent had exerted undue influence on the decedent in order to persuade him to change account titles and execute deeds, and that without a bond in the amount of $575,000.00, petitioners would suffer irreparable harm.[2] Petitioners amended their demand on May 29, 2013,[3] to include their exception to the First and Final Account that was filed in the Register of Wills Office in Sussex County on March 25, 2013. In her response to the amended complaint filed on July 31, 2013,[4] Respondent denied the allegations of undue influence and other wrongdoing, and counterclaimed for waste, misappropriation and other claims related to petitioners' continued occupancy of decedent's real property, which had passed by operation of law to respondent. Petitioners denied having committed any waste or misappropriation, and alleged that they had an agreement with their late father regarding the possession and use

---

[1] I use first names only to avoid repetition and confusion, and mean no disrespect by this practice.
[2] Docket Item ("DI") 1.
[3] DI 8.
[4] DI 10.

of the real property located at 32244 Powell Farm Road, Frankford, Delaware 19945 (the "Powell Farm Road Property").[5]

## Factual Background

Mr. Hall and his first wife divorced when their children were quite young. Anthony, who is the oldest of the three children, recalled that he was nine or ten years old when his parents separated. Mr. Hall was a member of the United States Air Force and was sent to Vietnam. Anthony's mother remarried and moved to Dover, taking Felicia and Aaron to live with her while Anthony resided with his paternal grandparents at the Powell Farm Road Property. When Mr. Hall returned from overseas, he was stationed at McGuire Air Force Base in New Jersey, and Anthony moved to New Jersey to live with his father. After Anthony graduated from high school in New Jersey, he attended college in Baltimore, Maryland, spending his school vacations and holidays with his grandparents, his father or his siblings. After he graduated from college, Anthony remained in Baltimore, got married, and raised a family there. Felicia followed Anthony to college in Baltimore, and also remained there to work and raise a family.

Mr. Hall served in the Air Force for 23 years, retiring in 1983 or 1984. After he retired, Mr. Hall returned to live with his parents, Mr. and Mrs. Aldon D. Hall at

---

[5] DI 13.

the Powell Farm Road Property.[6]   Anthony recalled meeting Catherine occasionally when he and his young family would visit Mr. Hall in Frankford. During those visits, he observed Catherine staying in a mobile home behind the main residence at the Powell Farm Road Property.  Even though he knew the couple had a long-standing committed relationship, Anthony was surprised when his father and Catherine announced in December 2007 that they were getting married.

Upon his return to Delaware, Mr. Hall worked with his father mowing lawns and doing handyman chores for other people.  Mr. Hall subsequently established a solely-owned business known as "Hall'ing" doing lawn and general maintenance work.[7]  When Aaron returned to Sussex County in 1987 with his own family, Aaron worked in his father's business, initially as a crew chief with other employees.  Around 2005 or 2006, as Mr. Hall began losing his physical strength and suffering some memory loss, Aaron took over the logistical and financial side of his father's business.  While Mr. Hall was still in his prime, whenever any of his grandsons reached the age of ten years, they would spend several summers at the Powell Farm Road Property helping out in the business.  Mr. Hall loved having his grandchildren with him, and took them on excursions to Ocean City to play miniature golf.

---

[6] Mrs. Aldon D. Hall died in September 2006.  Trial Transcript ("TT") 158.

On December 21, 2006, Mr. Hall had a fainting spell during which his heart stopped beating. He was resuscitated by paramedics, taken to the hospital for emergency treatment, and had a pacemaker installed.[8] Mr. Hall apparently had experienced a similar episode of fainting the month before this incident. On February 1, 2007, Mr. Hall was seen by a neurologist, Dr. Paul Peet, because Mr. Hall was having difficulty with his short-term memory.[9] According to Dr. Peet's trial deposition, Mr. Hall's history suggested that he had suffered some injury to the brain following his cardiac arrest.[10] Catherine accompanied Mr. Hall on this initial visit and each subsequent visit to Dr. Peet. In August 2007, the couple returned to Dr. Peet and Catherine reported that Mr. Hall was having difficulty in remembering the directions to places he previously had been or remembering people he should have known.[11] Mr. Hall, on the other, did not think his memory loss was significant.[12]

On December 5, 2007, Mr. Hall was taken to the hospital by paramedics after Catherine had noticed that he was having difficulty speaking on the telephone, and Mr. Hall had a seizure while in the emergency room.[13] At some

---

[7] TT 88-89.
[8] Joint Exhibit ("JX") 24 at 1.
[9] *Id.*
[10] Peet Deposition at 14.
[11] JX 24 at 5.
[12] *Id.*
[13] *Id.* at 6.

point during this month, Anthony, Felicia, and Aaron received invitations announcing their father's upcoming wedding to Catherine, which was scheduled to take place on January 1, 2008. On December 31, 2007, Mr. Hall executed two deeds in which he transferred two small parcels of solely-owned property to himself and his three children in undivided equal shares as tenants in common.[14] That same day, Mr. Hall was seen by Dr. Peet in a follow-up visit to his December 5th hospitalization.[15]

On January 1, 2008, Mr. Hall and Catherine were married with petitioners and other family members in attendance. Mr. Hall was nearly 67 years old and Catherine, then in her mid-fifties, was still working as a full-time administrative assistant in the Delaware Department of Correction. Catherine moved into the Powell Farm Road Property with her husband and his father ("Aldon D."), who by then was in his late 90s. Catherine helped Mr. Hall in caring for his elderly father, but she apparently was not interested in the lawn maintenance business that Mr. Hall conducted from his home office. According to Aaron, Catherine refused to take messages when customers telephoned the residence so Aaron gave them his telephone number.[16]

---

[14] JX 10.

[15] JX 24 at 6.

[16] TT 103-104.

On June 19, 2008, Mr. Hall visited Dr. Peet with a complaint of blurred vision and dizziness.[17] Catherine wanted her husband to be evaluated at Johns Hopkins Department of Neurology so Dr. Peet provided a referral. Up until this point, according to Dr. Peet, Mr. Hall had remained active and was still mowing lawns.[18] On September 23, 2008, Mr. Hall stood up and fell, apparently triggering another seizure that lasted about three minutes.[19] On October 2, 2008, Mr. Hall was seen by Dr. Paul Dash, a neurologist at Johns Hopkins, who made a clinical diagnosis of Parkinson's disease and some form of dementia other than Alzheimer's, which likely stemmed from the brain injury that occurred when his heart had stopped beating.[20]

On October 22, 2008, Catherine drove her husband, who was no longer able to drive an automobile, to Citizens Bank where he added Catherine's name as joint owner with right of survivorship to his three bank accounts.[21] On October 31, 2008, Catherine's name was added to a checking account already titled in the names of Aldon D. Hall and Aldon S. Hall at PNC Bank.[22] On January 22, 2009, Catherine's name was added to her husband's three accounts at the Bank of

---

[17] JX 24 at 8.
[18] Peet Deposition at 24-25.
[19] JX 24 at 9.
[20] *Id.* at 12.
[21] JX 13.
[22] JX 14.

Delmarva as a joint owner with right of survivorship.[23]    In June of that year, Catherine retired after 30 years of employment with the State.  On December 22, 2009, Mr. Hall executed a durable power of attorney document naming his wife as his agent.[24]  On December 24, 2009, Catherine was added to a membership account or accounts already titled in the names of Aldon S. Hall and Anthony S. Hall at the Dover Federal Credit Union.[25]  On February 17, 2010, Catherine's name was added to an account at PNC Bank owned solely by her husband.[26]

Dr. Peet saw Mr. Hall again on April 1, 2010, after Catherine noticed that her husband had a cough and was having some difficulty breathing.[27]  Dr. Peet suspected that he might have pneumonia.  During this visit, Dr. Peet observed that Mr. Hall was using a four-wheel walker whereas on previous visits, he had been able to walk independently. [28] On May 6, 2010, during a follow-up visit after Mr. Hall's hospitalization for pneumonia, Dr. Peet noted that Mr. Hall had arrived in a wheelchair.[29]

---

[23] JX 16.
[24] JX 6.
[25] JX 18.  It is unclear from the documentation how many accounts Mr. Hall had at this institution.
[26] JX 14.
[27] JX 24 at 18.
[28] Peet Deposition at 55-56.
[29] JX 24 at 19.

Upon his discharge from the hospital, Mr. Hall was admitted to a rehabilitation facility in Oak Orchard.[30] Catherine had a house that was handicap-accessible in Millsboro, and believed that Mr. Hall would have more room to move around there and that she could provide better care for her husband in the Millsboro house than at the Powell Farm Road Property.[31] Catherine also felt that she could not take care of both Mr. Hall and Aldon D.[32] Following a family meeting during which the parties arranged for other relatives to care for Aldon D. in his home,[33] Catherine and Mr. Hall moved into her Millsboro house. In the process of removing her husband's personal belongings from the Powell Farm Road Property, Catherine removed her husband's computer on which the current business records were maintained, without giving Aaron any warning of her intentions.[34]

Relations between Aaron and Catherine apparently had been strained for some time. Aaron testified that he and Catherine did not see "eye to eye" on a lot of issues and that she was fairly combative, which upset his father and grandfather.[35] Aaron also accused her of disparaging him in front of other

---

[30] TT 249.
[31] *Id.*
[32] TT 277.
[33] TT 171, 200-203.
[34] TT 104-105, 294.
[35] TT 105-106.

people.[36] Catherine denied this accusation, and countered with her belief that Aaron had taken advantage of her husband, who always gave Aaron extra money even though Aaron was just an employee of his father's business.[37] Mr. Hall's three children continued to visit him at Catherine's house in Millsboro, but Aaron only visited when his siblings were present because he felt unwelcome there.[38] Petitioners also were able to call and talk with their father using Catherine's cell phone after she disconnected Mr. Hall's cell phone because he could no longer handle it by himself.[39] Catherine and Mr. Hall still attended the church near the Powell Farm Road Property, and after church they visited with Mr. Hall's father and other family members living nearby. [40]

The Sunday church-going and visits ceased after Aldon D. died on August 17, 2010, five days short of his 100th birthday.[41] On September 2, 2010, Mr. Hall executed a deed transferring his real property on Blackwater Road to himself and Catherine as tenants by the entirety.[42] Aldon D. had died intestate survived by Mr. Hall and the two daughters of Mr. Hall's deceased brother. On November 3, 2011, Mr. Hall and his two nieces executed a deed transferring the Powell Farm Road

---

[36] TT 135.
[37] TT 240, 248.
[38] TT 106-107.
[39] TT 174.
[40] TT 44, 172.
[41] TT 27, 75.
[42] JX 8.

Property to Mr. Hall and Catherine as tenants by the entirety.[43] On December 7, 2011, in her capacity as agent for Mr. Hall, Catherine added her name to her husband's accounts at the Andrews Federal Credit Union.[44] Shortly thereafter, on January 21, 2012, Mr. Hall died at the age of 70.[45]

Analysis

A. Undue Influence

At trial, decedent's three adult children expressed their displeasure and disappointment with the fact that Catherine, who only was married to their father for four years, had received essentially all of Mr. Hall's assets.[46] Aaron had understood that he was going to take over the business after his father retired.[47] Felicia had told her father not to sign anything after he got married.[48] Anthony, who never discussed finances with his father,[49] acknowledged that Catherine should receive something, but felt it was unfair that she was getting everything.[50] Petitioners concede that there is no "smoking gun" in this case showing Catherine directly influencing Mr. Hall. Instead, petitioners argue that the circumstantial

---

[43] JX 20.
[44] JX 18.
[45] JX 22.
[46] During the trial, Catherine admitted that she had not contributed any funds to Mr. Hall's joint accounts. TT 290. She had her own separate bank accounts. TT 266-267.
[47] TT 94.
[48] TT 175.
[49] TT 56.

evidence demonstrates that Catherine effectively isolated her husband from his family at a time when he was cognitively impaired and deteriorating physically, and influenced him to transfer nearly all of his assets into their joint names.

Undue influence is a claim often raised in will contests to challenge a testator's change of beneficiaries or dispositions of property. Proving undue influence requires a challenger to demonstrate: (1) a susceptible testator; (2) the opportunity to exert influence; (3) a disposition to do so for an improper purpose; (4) the actual exertion of such influence; and (5) a result demonstrating its effect.[51] Undue influence has been described as an:

> excessive or inordinate influence considering the circumstances of the particular case. The degree of influence to be exerted over the mind of the testator, in order to be regarded as undue, must be such as to subjugate his mind to the will of another, to overcome his free agency and independent volition, and to compel him to make a will that speaks the mind of another and not his own. It is immaterial how this is done, whether by solicitation, importunity, flattery, putting in fear or some other manner. Whatever means employed, however, the undue influence must have been in operation upon the mind of the testator at the time of the execution of the will.[52]

Furthermore, undue influence must be established by a preponderance of evidence.[53] While circumstantial evidence may be considered, if the evidence

---

[50] TT 68.

[51] *See In re Estate of Gardner*, 2012 WL 5287948, at \*10 (Del. Ch. Oct. 14, 2012) (Master's Final Report) (citing *In re Estate of West,* 522 A.2d 1256, 1264 (Del. 1987); *In re Kohn,* 1993 WL 193544, at \*6 (Del. Ch. May 19, 1993); *In re Langmeier*, 466 A.2d 386, 403 (Del. Ch. 1983)).

[52] *Langmeier*, 466 A.2d at 403.

[53] *West*, 522 A.2d at 1264.

discloses one or more plausible alternative explanations for a testator's change of beneficiaries, then undue influence has not been established. [54]

Petitioners argue that as soon as Catherine moved in with her new husband, she took complete control over him. According to petitioners, Catherine alienated Aaron who was the only adult child living nearby, disconnected Mr. Hall's land line and cellular phone, removed his computer, and forced Mr. Hall to move to Millsboro, thereby separating him from his elderly father. Once she realized that Mr. Hall was not going to change his will, petitioners claim, Catherine made every effort to influence her husband to transfer approximately $500,000.00 in assets into her name for the alleged purpose of taking care of her. While Mr. Hall was in hospice care, Catherine had her name added as tenant by the entirety to the family homestead, i.e., the Powell Farm Road Property, and then used the power of attorney to add her name to his accounts in Maryland at the Andrews Federal Credit Union. Even after Mr. Hall's death, petitioners argue, Catherine's actions in collecting rent from a property solely- owned by her husband that passed under his will to Anthony, and in selling the classic automobile that her husband and Aaron had restored, demonstrate her greed and undue influence over her husband.

Although the parties strenuously dispute whether Mr. Hall was, in fact, susceptible to undue influence, I do not need to address this element because, after

---

[54] *Id.* at 1264-1265; *see also In re Estate of Konopka*, 1988 WL 62915, at *5 (Del.

reviewing the record, I conclude that petitioners have failed to establish by the preponderance of evidence the actual exertion of undue influence by Catherine. Over a period of three years following his marriage, Mr. Hall personally executed two deeds transferring real property to himself and his wife and personally authorized the addition of his wife's name to his numerous financial accounts with his signature on the bank application forms. There has been no demonstration that Mr. Hall's free will was overborne by Catherine during these trips to the bank or his attorney. Petitioners were not present during these events and, with the exception of Aaron who saw some bank statements at the Powell Farm Road Property, petitioners had no inkling of what Mr. Hall was doing with his property during his marriage. They were also unaware that Mr. Hall had transferred two-solely owned properties to them on the eve of his marriage to Catherine.

While it was true that Mr. Hall was somewhat isolated from his adult children, Anthony and Felicia visited their father in Millsboro about as frequently as they visited him at the Powell Farm Road Property, and on a few occasions they also accompanied Catherine and Mr. Hall on trips to medical specialists. Anthony and Felicia lived some distance away in Baltimore and had busy lives by virtue of their own families and employment. Aaron lived behind the Powell Farm Road Property and was in and out of the house frequently when his father lived there.

Ch. June 23, 1988).

The reduced frequency of Aaron's visits to his father in Millsboro, however, Aaron attributed not only to his feeling unwelcome at Catherine's home but also to his own work schedule.[55]

The attorney, who drafted the deeds to the Blackwater Road and Powell Farm Road properties and witnessed Mr. Hall's execution of these documents on two separate dates,[56] previously had represented Mr. Hall in a tax ditch dispute with a relative.[57]   This attorney also prepared a durable power of attorney document for Mr. Hall and served as notary public when Mr. Hall executed the power in favor of Catherine on December 22, 2009.[58]   During the trial, Catherine testified that she had no involvement in the transfers of the Blackwater Road and Powell Farm Road properties to her and her husband as tenants by the entirety.[59] Had Catherine been involved in the arrangements or somehow had influenced her husband to make these transfers, I would have expected to hear testimony from the attorney or the two nieces who joined in the conveyance of the Powell Farm Road Property to Mr. Hall and Catherine.

---

[55] TT 106-107.
[56] JX 8 & 20.
[57] TT 135-136.
[58] JX 6.
[59] TT 255-256.

Catherine testified that when they got married, Mr. Hall had told her that he wanted to take care of her.[60] Petitioners point to the fact that Catherine was much younger than Mr. Hall and was earning good salary; therefore, she did not need to be taken care of, unlike their father. Even though Catherine's testimony is self-serving, there is no evidence to contradict it and, furthermore, it is entirely consistent with their legal relationship as husband and wife.[61] This was a couple who had been in a committed relationship for approximately 25 years. Mr. Hall was having health issues when they married, and as his symptoms became worse, he began to add Catherine's name to his financial accounts. Petitioners view this as undue influence and control by Catherine. It is equally plausible that Mr. Hall added his wife's name to his accounts because he loved her and wanted his wife to have his assets in the very likely event that he predeceased her.

However, petitioners also argue that if Mr. Hall had wanted to take care of his wife, he could have executed a new will. Catherine had asked Mr. Hall to make a will shortly after they were married to let everyone know where they stood,[62] but he never made a new will. After Mr. Hall's death, Aaron found Mr. Hall's 1976 will in a filing cabinet at the Powell Farm Road Property and he and

---

[60] TT 253.

[61] *See* 13 *Del. C.* § 502.

[62] TT 176.

Anthony attempted to probate it.[63]   Petitioners argue that Catherine, unable to get Mr. Hall's will changed, simply found another way to get control of his assets. However, the fact that on the eve of his marriage, Mr. Hall transferred two solely-owned real properties to himself and his three children suggests that he already had begun the process of estate planning without having to change his will, and simply continued this same process over the next several years.

Since petitioners have failed to demonstrate by the preponderance of the evidence that the disputed property transfers and additions of Catherine's name to Mr. Hall's bank accounts were the product of undue influence, I recommend that the Court deny this exception to the First and Final Accounting.

B.  Joint Bank Accounts

In the alternative, petitioners argue that the accounts to which Mr. Hall added Catherine's name were intended only as convenience accounts by Mr. Hall, to enable Catherine to pay his bills, with the exception of three accounts at Citizens Bank which petitioners concede are true joint accounts.   Not surprisingly, Catherine argues that the evidence demonstrates that all accounts listed on the

---

[63] TT 55-56, 111.

amended estate inventory were true joint accounts with right of survivorship, and that petitioners should not be allowed to attempt to demonstrate otherwise.[64]

In claiming that all except three Citizens Bank accounts were intended to be convenience accounts, petitioners rely mainly on Aaron's testimony regarding a conversation that he had one time with his father or Catherine when they were working on the computer. Apparently, without his asking Mr. Hall a direct question, Aaron was told that Catherine's name was on the accounts to pay bills and to do what needed to be done around the property.[65] It is difficult to reconcile Aaron's self-serving testimony with the documentary evidence. Petitioners have conceded that the three Citizens Bank signature cards signed by Mr. Hall on October 22, 2008, unequivocally changed three accounts from individual to "joint with survivorship" with Catherine.[66] As will be discussed below, some of the other bank documents in the record contain similar unequivocal language.[67] Petitioners

---

[64] *See Walsh v. Bailey*, 197 A.2d 331 (Del. 1964) (parol evidence is not admissible to contradict a joint tenancy with right of survivorship where the signature card evidence is "sufficiently clear to impart the creation of a joint tenancy with right of survivorship.").

[65] TT 137-139.

[66] JX 13.

[67] The bank documents in the record also do not appear to be complete. For example, although the amended estate inventory lists a fourth account at Citizens Bank, a certificate of deposit (acct. no. ending in 2425), as jointly held with Catherine, JX 3, there are no bank documents in the record showing title to this Citizens Bank certificate of deposit.

have failed to proffer any reason why those accounts should be treated differently, i.e., as convenience accounts and not as true joint accounts.

Shortly after Mr. Hall added Catherine's name to his three Citizens Bank accounts, Catherine's name was added to a checking account (no. 5797102233) at PNC Bank owned by Aldon D. and Mr. Hall.[68]  This account was listed on the amended estate inventory as jointly held with Catherine.[69]  It appears to have been in the sole name of Aldon D. Hall when it opened on November 30, 2004 at the Mercantile Peninsula Bank under a different account number.  It appears that Mr. Hall's name was added to this account on February 24, 2005, based on the scan date of the Mercantile Peninsula Bank consumer signature card containing both signatures.[70]  The type of account ownership is not explicitly shown on the signature card.  On October 31, 2008, Mr. Hall and Catherine signed a PNC Bank account registration and agreement card listing this account in the names of Aldon D. Hall, Aldon S. Hall and Catherine B. Taylor Hall.[71]  Again, there is no explicit

---

[68] JX 14.

[69] JX 3.  The amended estate inventory lists three PNC Bank accounts as joint with Catherine:  (1) check acct. no. 57954462; (2) certificate of deposit no. 31200335805; and (3) checking acct. no. 5797102233.  The first checking account listed has the same account number except for the last digit as the account bearing the names of Mr. Hall and Catherine in JX 14.  There is no bank documentation showing title to the PNC Bank certificate of deposit.  The second checking account listed in the inventory has the same account number as the account bearing the names of Aldon D., Mr. Hall, and Catherine.

[70] *Id.* at 7.

[71] *Id.* at 6.

indication of ownership on the card. Another scan of this card on November 18, 2008, reveals that Aldon D. also signed the card authorizing the addition of Catherine's name to the account.[72]

Approximately 16 months later, Catherine's name was added to a second checking account at PNC Bank (no. 5797544621) which, according to the account registration and agreement card scanned on February 16, 2010, listed the typewritten names of Aldon S. Hall and Catherine B. Taylor Hall and contained on the second signature line a check mark with Catherine's signature next to it and a check mark on the line above where Mr. Hall was supposed to sign.[73] The following day, February 17, 2010, a copy of this card was scanned which contained Mr. Hall's signature next to the check mark on the first line.[74] Again, there is no explicit indication of ownership on this card.

There is a PNC booklet in the record entitled "Account Agreement for Personal Checking, Savings and Money Market Accounts," effective October 21, 2013, which states that "[i]f your Account is a joint Account, then you own your Account as joint tenants with the right of survivorship and not as tenants in common."[75] Catherine argues that this booklet, in conjunction with the account

---

[72] *Id.* at 5.
[73] *Id.* at 4.
[74] *Id.* at 3.
[75] JX 15 at 9.

records, demonstrates that these were both true joint accounts with right of survivorship.

There is no evidence that Aldon D. ever received a booklet containing this information when he added his son's name and, later, Catherine's name to his checking account. There is no evidence that Aldon D. intended to create a true joint account with right of survivorship with either his son or Catherine.[76] Therefore, in determining the ownership of checking account no. 5797102233, I must rely on the following legal presumptions. First, joint tenancies with right of survivorship are not favored in Delaware and there is a rebuttable presumption that people do not own property under a true joint tenancy unless they make their intentions explicit in the language used to create title to the property.[77] Second, a transfer of property for no consideration between close family members, such as a husband and wife or a parent and child, is presumed to be a gift.[78]

Applying these rebuttable presumptions here, when Aldon D. added his son's name to his account at Mercantile Peninsula Bank (predecessor to PNC Bank account no. 5797102233), he created a tenancy in common and made a gift of 50 percent of his funds in this account to his son. When Catherine was later added to

---

[76] *See In re Estate of Rufus Barnes, Sr.,* 1998 WL 326674 (Del. Ch. June 18, 1988) (evidence as to the creation of the joint bank account included testimony from the employee of PNC Bank who opened the account for the decedent and gave him a booklet that explained joint accounts).
[77] *Id.* at *4.

this account in 2010, Aldon D. and Mr. Hall each made a gift one-third of his undivided share of the funds in this account respectively to Catherine as his daughter-in-law and spouse. Applying the legal presumptions, Aldon D., Mr. Hall, and Catherine were tenants in common, each owning an undivided one-third share of the funds in this account.

When Aldon D. died on August 17, 2010, one-third of the value of account no. 5797102233 on the date of his death should have been included in his estate. After Aldon D.'s death, Mr. Hall and Catherine, presumably still as tenants in common, each then owned an undivided 50 percent share of the funds. Similarly, when Mr. Hall added Catherine's name to PNC Bank checking account no. 5797544621, Mr. Hall is presumed to have given his wife 50 percent of the funds in this account as a tenant in common. When Mr. Hall died on January 21, 2012, 50 percent of the value of checking account no. 5797102233 and checking account no. 5797544621 on the date of Mr. Hall's death should have been listed on the amended estate inventory as an estate asset, and not jointly held with Catherine.

Aaron's testimony implying that Mr. Hall only intended to add his wife's name to his accounts to pay his bills does not rebut the presumption that they held the accounts as tenants in common. Prior to Mr. Hall adding his wife's name to account no. 5797544621, he had added her name as joint owner with right of

---

[78] *See Hudak v. Procek*, 727 A.2d 841, 843 (Del. 1999).

survivorship to his three accounts at Citizens Bank, and he went on to add her as a joint owner of his accounts at The Bank of Delmarva and Dover Federal Credit Union. In other words, he established a pattern of adding his wife as joint tenant with right of survivorship and not as tenants in common.[79]

Moreover, Mr. Hall's pattern of adding his wife's name to his accounts at Citizens Bank, the Bank of Delmarva, and Dover Federal Credit Union as a joint owner with right of survivorship reveals his intent, and is sufficient to rebut the legal presumption that Mr. Hall held checking account nos. 5797544621 and 579710223 with his wife as tenants in common. Based on this evidence, I conclude that Mr. Hall intended to hold the two PNC Bank accounts with his wife as joint owners with right of survivorship. Since these two accounts were properly listed as true joint accounts on the amended inventory of Mr. Hall's estate, I recommend that the Court dismiss petitioner's exception to the First and Final Accounting as to these two PNC Bank accounts.

On December 7, 2011, Catherine added her name as joint owner of Mr. Hall's membership at Andrews Federal Credit Union using the durable power of attorney that Mr. Hall had executed in her favor on December 22, 2009.[80] Petitioners argue that Catherine's conduct was a breach of her fiduciary duty of loyalty to Mr. Hall, who at the time was near death and unable to benefit from this

---

[79] JX 16 and JX 18.

transaction. The record shows that the power of attorney document was drafted by the same attorney who drafted the two deeds transferring the real property at Powell Farm Road and Blackstone Road to Mr. Hall and Catherine as tenants by the entirety.[81] Among the powers Mr. Hall had delegated to Catherine was the unambiguous authority to make gifts to herself or any other person.[82] Since Mr. Hall was represented by counsel who both prepared the document and notarized Mr. Hall's signature, I do not find that Catherine breached her fiduciary duty to her husband when she added her name as a joint owner of his membership account at Andrews Federal Credit Union.[83]

Furthermore, while the membership application simply lists Catherine as a "joint owner," any ambiguity in this title is removed by the beneficiary designation portion of the application – which was left blank here – that states: "The following beneficiary(ies) are to receive the proceeds of my accounts in the event of my death. If these accounts are jointly held, the beneficiary(ies) are to receive the funds only in the event of the death of all account holders. …."[84] Therefore, these accounts were properly listed as true joint accounts on the amended inventory of Mr. Hall's estate.

---

[80] JX 6 and 17.
[81] JX 6, 8, and 9.
[82] JX 6 at 2, ¶ 18. *See Schock v. Nash*, 732 A.2d 217, 225-227 (Del. 1999).
[83] *Schock*, 732 A.2d at 229.
[84] JX 17.

On December 24, 2009, Mr. Hall added his wife to his share/savings and money market accounts at the Dover Federal Credit Union.[85] The application that the couple signed explicitly designated Catherine as a joint tenant with right of survivorship.[86] However, when this application was submitted, Anthony was also a joint member/owner of his father's account(s) at the Dover Federal Credit Union.[87] At trial, Anthony testified that his father had opened an account at the Dover Federal Credit Union in 1977, and that Anthony himself had made deposits into their joint account(s).[88] Anthony also testified that he later found out that Catherine had used the durable power of attorney to close out the account(s).[89]

---

[85] JX 18. No account number is listed for the "share/savings" account on the application. *Id.* at p21. The money market account number was listed as 80837688, which consisted of a suffix added to the end of the "member number." Mr. Hall's member number was 808376000 on this application. The amended inventory of Mr. Hall's estate lists "Dover Federal Credit Union 6000" and Dover Federal Credit Union Primary Shares Acct." as jointly owned with Catherine. JX 3. However, Mr. Hall was listed as having a different "membership" number (718520007) on the contact details entry form dated December 24, 2009, wherein it was entered that Mr. Hall and Catherine wanted to close an account but were not able to have "joint member Anthony sign to allow this…." JX 18 at p16. This entry goes on to state that a manager "says it would be ok to leave the CD so the members can keep their rate." *Id.*

[86] The application form had three boxes labeled "Individual," "Joint Account with Rights of Survivorship," and "Joint Account without Rights of Survivorship." The box labeled "Joint Account with Rights of Survivorship" was checked above Catherine's name in the "joint owner" section. JX 18 at p22.

[87] *Id.* at p16 and p20.

[88] TT 30-31.

[89] *Id.* at 32.

Given this testimony, there may have been another account at Dover Federal Credit Union that was the original joint account opened by Mr. Hall with Anthony in 1977, which was closed by Catherine using her power of attorney sometime prior to Mr. Hall's death. If Catherine closed another account owned by Mr. Hall and Anthony as joint tenants with right of survivorship or as tenants in common, and disproportionately converted the funds in the account, Anthony may have an equitable action against her.[90]

Although it appears that the two Dover Federal Credit Union accounts listed in the amended estate inventory as jointly owned with Catherine are true joint accounts, the lack of or the discrepancy in account numbers for the two Dover Federal Credit Union accounts listed on the inventory, as compared to the application forms in JX 18, makes me hesitate to dismiss this exception. Therefore, I recommend that the Court order Catherine to request documentation from Dover Federal Credit Union regarding the survivorship status of these accounts to confirm that the two accounts listed in the amended inventory are the same two accounts described on the application form in JX 18. Also, in the interest of justice and a full resolution of the issues, I recommend that the Court allow Anthony additional time to provide the Court with further documentation concerning the joint account that he once held with Mr. Hall which may have been

---

[90] *See Mack v. Mack*, 2013 WL 3286245, at **2-3 (Del. Ch. June 2013).

closed by Catherine, including any information concerning the subsequent disposition of those funds.

The record also contains an Infinex Financial Group brokerage account monthly statement addressed to "Aldon S. Hall" and "Catherine B. Taylor Hall JTWROS."[91] Although the initials suggest that this was a true joint account, there is nothing in the record showing when the account was opened, by whom, or with what authority. More evidence is needed before a determination can be made that this asset was correctly listed as jointly held with Catherine on the amended estate inventory. Therefore, I recommend that the Court order Catherine to request documentation from Infinex regarding the survivorship status of this account.

At trial, Catherine admitted that she had been collecting monthly rental income from the tenant of real property solely owned by Mr. Hall that, after Mr. Hall's death, had passed to Anthony under the terms of Mr. Hall's 1976 will. Some of the rents had been collected prior to Mr. Hall's death. Catherine testified that she had accumulated rental income in the amount of $6,240.00 as of January 2014, which was still "available."[92] None of these funds appear to have been included on the First and Final Accounting. I recommend that the Court order Catherine to provide an accounting of all the rental income she has collected no later than 30 days after this report becomes a final order of the Court and,

---

[91] JX 19.

assuming the accounting is approved, to submit a revised First and Final Accounting, if necessary, to reflect the amount of rental income that belongs to the estate.

At trial, there was testimony concerning an antique car that had been owned by Mr. Hall, which Catherine subsequently sold for $5,000.00 to pay estate debts.[93] Aaron had worked with his father on restoring this car,[94] and viewed its sale as an act of pure spite by Catherine. Catherine denied this, claiming that she needed to sell the car to provide cash for estate expenses.

In the amended estate inventory, Catherine listed this vehicle, a 1931 Plymouth Classic, on Schedule E as solely-owned personal property of the decedent with a date of death fair market value of $5,425.00.[95] The only other solely-owned property was miscellaneous farm equipment of unknown value. Since the jointly-held accounts and real estate passed outside of the estate, the total of probate assets was $5,425.00.[96] In the First and Final Accounting, additional assets consisted of Catherine's own contribution to the estate of $10,601.00.[97] The funeral expenses were $9,190.00, administrative expenses totaled $801.00,

[92] TT 300-302.
[93] TT 258-260.
[94] TT 100-101.
[95] JX 3.
[96] *Id.*
[97] JX 4.

attorney fees were $6010.00, and closing costs were $25.00, leaving a zero balance in the hands of the personal representative.

Depending upon the accounting and whatever additional bank documentation is provided, revisions to the First and Final Accounting may be necessary. In the end, it may turn out that there were sufficient liquid assets in the estate to cover its expenses. While it may be impossible to recover the antique car itself, it may be appropriate to surcharge Catherine, as personal representative, for the difference between the sales price and the fair market value of the vehicle.

Finally, there are two accounts listed in the amended inventory as jointly held with Catherine, for which there is no documentation whatsoever regarding title. These are Citizens Bank Certificate of Deposit Ending 2425 (item 3 on Schedule D) and PNC Certificate of Deposit 31200335805 (item 6 on Schedule D).[98] I recommend that the Court order Catherine to request documentation from Citizens Bank and PNC Bank regarding the survivorship status of these certificates of deposit. If Catherine is unable to obtain sufficient evidence regarding the survivorship status of these accounts and of other accounts where I have made similar recommendations, I will consider additional briefing from the parties regarding what additional relief, if any, may be appropriate.

---

[98] JX 3.

## Conclusion

For the above reasons, I recommend that the Court (1) dismiss petitioners' exception to the First and Final Accounting based on their claim of undue of influence; (2) dismiss petitioners' exception based on their claim that the Bank of Delmarva accounts and PNC Bank accounts discussed above are not true joint accounts; (3) dismiss petitioners' exception to the Andrew Federal Credit Union accounts based on their breach of fiduciary claim; (4) order Catherine to obtain additional documentation regarding Citizens Bank acct. no. ending in 2425, PNC Bank acct. no. 311200335805, Dover Federal Credit Union 6000 and Primary Shares accts., and Infinex Financial Brokerage acct. no. A6X-301523; (5) order Catherine to account for the rental income from 32669 Jones Road; and (6) allow Anthony additional time to obtain more documentation regarding the Dover Federal Credit Union joint account or accounts that were opened in 1977.

Respectfully,

/s/ Kim E. Ayvazian

Kim E. Ayvazian
Master in Chancery

KEA/kekz
cc:    Richard E. Berl, Esquire
       Jason C. Powell, Esquire