**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| IMO Last Will and Testament of Ethel Smith, | ) | C.A. No. 8532-MA |
| | ) | |

**MASTER'S REPORT**

Date Submitted: October 6, 2014
Draft Report: April 9, 2014
Final Report: January 8, 2015

Pending before me is a petition under 12 *Del. C.* § 1309, seeking a court order declaring the Last Will and Testament of Ethel E. Smith void for lack of testamentary capacity and as the product of undue influence. Petitioners are Ralph E. Smith, Jr., Paula Smith, Debbie Kidwell, and Ralph E. Smith, III. Respondents are Tammy Reed, Nancy Vogts, Sean Reed, and Jeremy Reed. At the conclusion of the trial held on April 9, 2014, I issued an oral draft report from the bench, recommending that the petition be denied because Petitioners had failed to demonstrate any exercise of undue influence on the decedent or lack of testamentary capacity when the decedent executed her Last Will and Testament on December 18, 2012. Petitioners filed a timely exception to my draft report under Court of Chancery Rule 144. After review of the parties' briefs, I am again recommending in this final report that the petition be denied.

Factual Background

Mrs. Smith died on January 14, 2013, at the age of 88. According to the petition, in her final years Mrs. Smith had suffered from pulmonary fibrosis and had difficulty eating and retaining the food she ingested.[1] She was a widow and lived alone in her home in Milton, Delaware. Ralph Smith, Jr. is the biological son of the sister of Mrs. Smith's late husband.[2] The couple raised Ralph, Jr. from birth and eventually adopted him.[3] Paula is the current wife of Ralph, Jr., and the stepmother of Ralph III.[4] Ralph, Sr. had had a son from a previous relationship, who was the father of Kidwell.[5] Kidwell enjoyed a close relationship with Mrs. Smith over the years, and considered Mrs. Smith as her grandmother.[6] Mrs. Smith herself had been unable to have any children.[7]

Tammy Reed is the ex-wife of Ralph III.[8] By the age of 16, Tammy had lost both her mother and grandmother so when she started living with Ralph III in

---

[1] There was very little medical evidence introduced at trial regarding Mrs. Smith's medical condition. The parties initially were *pro se*. After trial, Petitioners retained counsel to represent them in taking exception to my draft report.
[2] Trial Transcript ("TT") 50.
[3] *Id.* I use first names here only to avoid confusion and unnecessary repetition. I intend no disrespect by this practice.
[4] TT 31.
[5] TT 47
[6] TT 42.
[7] TT 35, 50.
[8] TT 35.

1993,[9] she viewed Mrs. Smith as a mother/grandmother figure.[10] After Tammy and Ralph III divorced in 2000,[11] Tammy married Sean Reed, with whom she had two sons, Paul and Christopher.[12] Tammy and Sean subsequently divorced, but they share custody of their young sons. Mrs. Smith loved babies, and was especially fond of Paul.[13] She often babysat for Paul even after he started going to school.[14] Nancy Vogts is a long-time friend of Sean and, as a result of her friendship with Sean and Tammy, Vogts became acquainted with Mrs. Smith.[15] The two older women were friends during the last 13 years of Mrs. Smith's life.[16] Jeremy Reed is Sean's brother.

Both Ralph, Jr. and Ralph III described Mrs. Smith as having been on good terms and bad terms with them throughout their lives.[17] In particular, Ralph III described Mrs. Smith as very controlling and overbearing.[18] Mrs. Smith always wanted Ralph III to work as much as possible, and was bothered whenever he was unemployed.[19] When Ralph III was married to Tammy, Mrs. Smith and her late

---

[9] TT 32.
[10] TT 38, 105.
[11] TT 30
[12] TT 79.
[13] TT 34-35.
[14] TT 56-57.
[15] TT 98.
[16] TT 99.
[17] TT 52.
[18] TT 40-41.
[19] TT 30.

husband contributed to the young couple's household expenses by lending them money.[20] Mrs. Smith kept books in which she recorded the amount of money she had lent to people, and when she died, Ralph III calculated that he still owed his grandmother about $800.00.[21]

Paula described Mrs. Smith as very opinionated and stubborn.[22] During the last three years of Mrs. Smith's life, Paula would help her mother-in-law as needed after Mrs. Smith's close friend and neighbor moved away.[23] Another neighbor brought Mrs. Smith food during the last year of her life.[24] Mrs. Smith would return the empty containers to this neighbor with thanks, telling him how much she had enjoyed his food.[25] Mrs. Smith did not discuss her illness with him; instead, she talked about her home and household projects because she was always cleaning house.[26] During the last three months of Mrs. Smith's life, Paula and Ralph Jr. tried to convince Mrs. Smith to live with them, but Mrs. Smith refused to leave her home.[27]

---

[20] TT 39.
[21] TT 39.
[22] TT 113, 120.
[23] TT 113.
[24] TT 123-124.
[25] TT 125. This neighbor never knew until after Mrs. Smith's death that Mrs. Smith had been unable to eat any of the food he had given her. TT 124.
[26] TT 125.
[27] TT 113.

During the last three months of Mrs. Smith's life, Paula was her primary caregiver, stopping by Mrs. Smith's home every day to assist her or to take her to medical appointments.[28] On December 7, 2012, after Mrs. Smith had been discharged from the hospital, hospice nurses began to care for Mrs. Smith in her home. [29] On the evening of December 18th, Sean, Jeremy, and Vogts arrived at Mrs. Smith's house.[30] Paula was present in the house when Mrs. Smith executed a will that Vogts had drafted at Mrs. Smith's request.[31] The two witnesses were Vogts and Sean, and Jeremy notarized the document.[32]

In her Last Will and Testament (hereinafter "the Will"), Mrs. Smith bequeathed her 2002 Ford Taurus automobile to Tammy, her curio cabinet and its contents to Kidwell, and $1,000.00 to Kidwell's daughter, Candace.[33] Mrs. Smith left her residuary estate to Ralph Jr., Paula, Kidwell, Tammy, Paul, and Christopher. Mrs. Smith indicated in the Will that if Ralph, Jr. wanted to acquire her house, he might buy out the remaining beneficiaries after an appraisal of the fair market value of the property, exclusive of contents and personal belongings, provided the other beneficiaries consented, otherwise the property was to be sold

---

[28] *Id.*
[29] TT 10-11.
[30] TT 117.
[31] TT 89, 99.
[32] TT 89.
[33] TT 43-44.

and divided equally. Mrs. Smith named Ralph, Jr. as executor, but if he was unable to serve, then she named Tammy as executrix of her estate.[34]

The following day, Paula asked Mrs. Smith where her will was located in case something happened to her, and Mrs. Smith told Paula that it was underneath the desktop.[35] According to Paula, she did not bother to look at the document until a few weeks later in January when Mrs. Smith fell into a coma.[36] When Paula read the Will, she was shocked because it did not reflect what Mrs. Smith had previously told Paula were her estate plans.[37] Ralph, Jr. was likewise shocked because, according to his testimony, he was supposed to get his mother's house, which he would use to obtain a loan to provide the funds that Mrs. Smith wanted to give Tammy's children.[38] After that loan was repaid, Ralph III was supposed to receive Mrs. Smith's house.[39]

## Issues

In their Opening Brief, Petitioners explicitly state that they are not taking exception to my finding that there was insufficient evidence to demonstrate that Mrs. Smith lacked testamentary capacity. Petitioners instead focus their exceptions on my conclusion that there was no undue influence shown.

---

[34] A copy of the Will is attached as an exhibit to the petition. Docket Item 1.
[35] TT 118.
[36] TT 119.
[37] *Id.*
[38] TT 67.

Petitioners complain that I did not address in my draft report all of the elements of undue influence. They argue that Mrs. Smith was susceptible to undue influence, and that Respondents had the disposition and opportunity to exert their influence over her. They argue that the facts and circumstances surrounding the execution of the Will demonstrate that Respondents actually exerted influence over Mrs. Smith. Finally, Respondents argue that the Will is the result of undue influence because it contained bequests that are contrary to what Mrs. Smith had told her son and daughter-in-law she wanted in her will.

Analysis

Undue influence is described as an excessive or inordinate influence considering the circumstances of a particular case.[40] The degree of influence exerted over the testatrix must be such as to subjugate her mind to the will of another, and to compel her to make a will that is not her own, but that reflects the mind of another.[41] However this is accomplished, the undue influence must have been in operation upon the mind of the testatrix at the time of the execution of the will.[42]

In order to for a court to find undue influence, the following elements must be demonstrated by a preponderance of the evidence: (1) a susceptible testatrix;

---

[39] TT 68.
[40] *See Matter of Langmeier*, 466 A.2d 386, 403 (Del. Ch. 1983).
[41] *Id.*

(2) the opportunity to exert influence; (3) a disposition to do so for an improper purpose; (4) the actual exertion of such influence; and (5) a result demonstrating its effect.[43] I will now address each element to determine whether Petitioners have demonstrated all of the elements by a preponderance of the evidence.

Susceptible Testatrix:

There is no question that Mrs. Smith was in very poor health and under hospice care when she executed the Will. Mrs. Smith was on oxygen and taking several medications, including morphine, which could have affected her mentally.[44] The only evidence of any altered mental state was a hospice nurse's observation that Mrs. Smith might have been suffering some confusion because she responded differently to the nurses when Paula was not present than when she was talking to Paula.[45] However, another hospice nurse described Mrs. Smith as alert, talking normally, and able to make her own judgments generally throughout December 2012.[46]

Paula testified that Mrs. Smith was upset and crying on December 18th.[47] Mrs. Smith had just come back from the doctor's office where she had been seen

---

[42] *See In re Estate of Reed*, 1995 WL 694423 (Del. Ch. Oct. 25, 1005).
[43] *In re Estate of West*, 522 A.2d 1256, 1264 (Del. 1987).
[44] TT 11-12, 25, 27, 126.
[45] TT 12, 21.
[46] TT 13-14, 16.
[47] TT 117.

for her continuing problem with retaining food.[48] She was not scheduled for another surgery to address this problem until January but, according to Paula, Mrs. Smith did not think that she could remain alive until that surgery.[49]

Mrs. Smith's signature on the Will does not give any indication that she was suffering emotional distress that evening. Her signature is evenly formed, positioned directly above the signature line, and written in an elegant cursive hand. Mrs. Smith was not yet bedridden, and was still able to live alone with people present to assist her only during the daytime.[50] However, for the sake of this analysis, I will assume that Mrs. Smith was a susceptible testatrix.

Opportunity to Exert Influence:

The record shows that Tammy had an opportunity to exert influence over Mrs. Smith. The two women lived near each other, saw each other at least once a week, and spoke to each other on the phone frequently.[51] Mrs. Smith loved Tammy's children, especially Paul.[52] Ralph, Jr. described Paul as the "apple" of Mrs. Smith's eye.[53] Petitioners contend that Mrs. Smith's desire to keep Tammy

---

[48] *Id.*

[49] *Id.*

[50] During the last few weeks of Mrs. Smith's life, at Paula's request, Tammy helped care for Mrs. Smith by coming over to her house late at night, after Tammy's children were in bed, to administer her evening medications and assist Mrs. Smith with her CPAP machine. TT 113-114.

[51] TT 103.

[52] TT 114-115.

[53] TT 56.

happy made her more predisposed to Tammy's wishes, and therefore susceptible to influence. At trial, Tammy denied exerting any influence over Mrs. Smith, claiming that she never asked Mrs. Smith for money, although she acknowledged that she had received checks in her name that were intended as gifts for her children.[54]

The record shows that Paula and Ralph, Jr. also had the opportunity to exert influence over Mrs. Smith. Paula saw Mrs. Smith every day for the last three months of Mrs. Smith's life and, moreover, had been helping Mrs. Smith draft a will for over a year.[55] Paula testified that she only hesitated to act as the notary because, as Mrs. Smith's daughter-in-law, she thought it might be illegal.[56] According to Paula, Mrs. Smith's estate plan was for Ralph, Jr. to get the house and Paul to get some money, but the money was to be held in trust so Tammy could not get her hands on it.[57] According to Ralph, Jr., the plan was for Paul to receive $10,000.00 and Christopher to receive $5,000.00, both amounts to be held in trust so Tammy could not touch the money.[58] According to Paula, at some point Mrs. Smith had wanted to leave Candace $10,000.00.[59]

---

[54] TT 106.
[55] TT 113-114.
[56] TT 118.
[57] TT 115.
[58] TT 57-58.
[59] TT 119.

After Mrs. Smith was discharged from the hospital in December, it was evident to her family that she would no longer be able to drive. Mrs. Smith's car registration was going to expire at the end of the month, so Ralph Jr., told his wife that if his mother was going to give him the car, they should title the car in his name before the registration had to be renewed.[60] Paula testified that when Mrs. Smith was informed of this plan, she objected to it. Mrs. Smith told Paula that Tammy had asked for the car, that it was the only thing Tammy had ever asked for, and that Mrs. Smith was going to give the car to Tammy, even though she believed that Ralph, Jr. would be upset about it.[61] Ralph, Jr. was not upset. Ralph, Jr. testified that it was his suggestion that his mother leave the car to Tammy in her will because he thought Tammy needed a safer car than the one she was then using to transport her sons.[62]

According to Paula, however, Mrs. Smith agreed with Paula's suggestion to transfer the car to Tammy immediately, and so Mrs. Smith made Paula her agent solely for the purpose of transferring the car's title.[63] Paula and Tammy then met at the Department of Motor Vehicles and completed the transfer, but as part of the

---

[60] TT 115-116.
[61] TT 117.
[62] TT 58.
[63] TT 116.

arrangement Tammy had to give Ralph, Jr. the car's license tag.[64] Thus, it appears from the evidence that Tammy, Ralph, Jr., and Paula all had the opportunity to exert influence over Mrs. Smith.

Disposition to Exert Influence for an Improper Purpose:

Petitioners argue that Tammy had the disposition to exert influence over Mrs. Smith because she knew she had leverage, i.e., she could stop bringing Paul to see Mrs. Smith. However, the only evidence of this leverage comes from Ralph, Jr. According to his testimony, Mrs. Smith was upset with Tammy because Tammy had been responsible for the breakup of her marriage with Sean,[65] and Mrs. Smith did not want Tammy to get control of Paul's money. However, Mrs. Smith was afraid to say anything to Tammy because if she did, Tammy would stop allowing Mrs. Smith to see Paul.[66] This argument only makes sense if Tammy knew of Mrs. Smith's testamentary scheme, i.e., her plan to leave trust funds for Tammy's children. However, according to Ralph, Jr., his mother would have never spoken to Tammy about her will.[67] If Tammy had no knowledge of Mrs. Smith's testamentary scheme, then Tammy would have had no reason to exert her

---

[64] TT 117. It is unclear from the record whether Mrs. Smith intended Tammy or her son to have the license tag. In any event, when Ralph, Jr. discovered the contents of the Will in January 2013, he somehow arranged for title of the 2002 Ford Taurus to be transferred from Tammy's name into his own name. TT 75-76.
[65] TT 60, 64-65.
[66] TT 62.
[67] TT 64.

influence for the improper purpose of forcing Mrs. Smith to change her will by threatening to stop Paul's visits.

Petitioners also argue that Tammy's disposition to exert influence is proven by the testimony of Ralph, Jr., who stated that when he asked Tammy about the will, she replied that she did it for her boys.[68] To the extent that Petitioners are characterizing this statement as a wholesale admission of guilt by Tammy, Ralph, Jr.'s testimony is self-serving. However, this statement is consistent with Paula's testimony that Mrs. Smith had told her in December that the only thing Tammy had ever asked for was the car. If Tammy had asked Mrs. Smith to leave her the car to transport her boys, a request that Ralph, Jr. agreed was entirely reasonable, then there is no credible basis to extrapolate from this statement that Tammy had the disposition to exert undue influence over Mrs. Smith for an improper purpose.

Petitioners argue that Sean, Jeremy and Vogts also had the opportunity to exert influence over Mrs. Smith on December 18th, pointing to the circumstances of the will execution itself. According to Petitioners, when Respondents arrived unexpectedly at Mrs. Smith's house, Jeremy kept Paula busy in the kitchen so that Paula did not realize what Sean and Vogts were doing. These actions, Petitioners contend, demonstrate not only that Sean, Jeremy, and Vogts had dispositions to

---

[68] TT 64.

exert influence on Mrs. Smith, but also that they actually exerted their influence on Mrs. Smith to benefit Tammy and her children.

Although Sean's children are two of the beneficiaries of the Will, there is no evidence that Sean had any disposition to exert influence over Mrs. Smith for an improper purpose. According to Vogts, Sean was unaware of the contents of the Will until Vogts reviewed the document word by word with Mrs. Smith while Sean was standing next to them.[69] There is also no evidence that Vogts and Jeremy had dispositions to exert influence over Mrs. Smith for any improper purpose. Vogts and Mrs. Smith were long-time friends, but Vogts received no gift in the Will. There is no evidence that Jeremy had any prior relationship with Mrs. Smith, and there is no evidence that Jeremy even received payment for his service as notary public.

Paula was present in the house during this entire time. It was Vogts's belief that Paula was aware of what was happening since Paula was standing right beside them as they talked with Mrs. Smith.[70] Even when Paula was talking with Jeremy in the kitchen, she was separated from the living room where Mrs. Smith was sitting only by a kitchen counter and an overhead cabinet.[71] Respondents made no effort to hide what they were doing. After Mrs. Smith and the two witnesses

---

[69] TT 91, 97.
[70] TT 99.
[71] TT 80-88.

signed the document, it was placed on the kitchen counter for Jeremy to notarize.[72]

Therefore, Petitioners have failed to demonstrate by the preponderance of evidence that any of these three Respondents had the disposition or opportunity to exert influence over Mrs. Smith.

Actual Exertion of Undue Influence:

Paula testified that she had no idea a will was being executed and if it had been read out loud, she would have objected because it was not what Mrs. Smith had told her.[73] According to Paula, even after the will was executed, Mrs. Smith kept saying that Ralph, Jr. was getting the house and Tammy was getting the car.[74] Petitioners argue that the circumstances surrounding the execution of the will, especially the fact that it was not read out loud, demonstrate an actual exertion of undue influence by Respondents.

It is difficult to discern how the trio could have exerted such influence in the close quarters of Mrs. Smith's house with Paula present. Paula was standing only four or five feet away from Vogts, Sean, and Mrs. Smith, within earshot of everyone.[75] Sean, Vogts, Jeremy and Mrs. Smith simply were going about the private business of Mrs. Smith without directly involving Paula, who is one of the beneficiaries of the Will. This episode was not the first time that Vogts had helped

---

[72] TT 88-90.
[73] TT 117-118.
[74] TT 118.

Mrs. Smith prepare a will.[76]  In a previous will, drafted by Vogts when Paul was still a baby, Mrs. Smith left 50 percent of her property to Paul.[77]  According to Vogts, Mrs. Smith's previous will had been witnessed by two other people, but this time, Mrs. Smith asked Vogts to serve as a witness and to find a second witness.[78]  The only person whom Vogts knew was acquainted with Mrs. Smith was Sean.  Vogts asked Mrs. Smith if she had any objection to Sean serving as a witness, and Mrs. Smith said absolutely not.[79]

In support of their claim of undue influence, Petitioners also point to Ralph, Jr.'s testimony:  "[I]f Paula had known anything at all about what was going on [that night], she'd have read that will.  And she has kicked herself in the butt and the head so many times over it because that will was not read to my mother, nor did my mother read it …"[80]  However, Ralph, Jr. and Paula often contradicted each other's testimony, and sometimes their own testimony was contradictory.  According to Paula, she had been working on a will for Mrs. Smith for over a year, a will that was never finalized.  On the day following the appearance of Sean, Jeremy, and Vogts at Mrs. Smith's house, Paula asked her mother-in-law what they had been doing.  On December 19th, Mrs. Smith told Paula she had executed a will

---

[75] TT 80, 86.
[76] TT 92.
[77] TT 93-94.
[78] TT 96, 99.
[79] TT 96.

the night before, and also told Paula where the Will was located.[81] Yet, Paula apparently was not curious enough to examine the will for several weeks, at least not until Mrs. Smith had fallen into a permanent "coma."[82] At trial, Paula explained her behavior as follows:

> I never bothered with that will anymore because I assumed she wasn't lying to me and I assumed that everything was taken care of. Tammy was going to get the car. Ralph was going to get the house and do whatever they had discussed about monies because she wanted Paul to have monies and she didn't have any money because she had to turn in her CDs to live.[83]

Paula's behavior following Mrs. Smith's disclosures to her on December 19th undermines Ralph's testimony. Had anything been amiss on the evening of December 18th, Paula would have been in a position to hear or observe it. Upon Paula's learning the following day that a will had been executed by her mother-in-law, one would have expected Paula to become suspicious and to have reviewed its contents since she knew the Will's location. Instead, she simply left it unexamined under the desktop where Mrs. Smith had placed it. Upon reviewing the entire trial transcript, I find that Petitioners have failed to demonstrate by the preponderance of evidence that any undue influence was actually exerted by Tammy, Sean, Jeremy, or Vogts.

Result:

---

[80] TT 75.
[81] TT 118, 121.
[82] TT 119.

The final element needed to prove undue influence is a result demonstrating the effect of the exertion of undue influence. For the sake of completeness, I will address this element, even though Petitioners have failed to demonstrate by the preponderance of evidence that any of the Respondents had a disposition to exert influence for an improper purpose or actually exerted undue influence over Mrs. Smith.

Petitioners claim that the bequests in the Will are the result of undue influence because the only change in Mrs. Smith's prior testamentary scheme was that Tammy was supposed to get the car. Instead of Tammy getting the car, Ralph, Jr. getting his mother's house, and Tammy's two young sons getting monies to be held in trust, the house is to be split six ways and Ralph has to buy out the five other owners in order to "get" his mother's house.

I shall assume, for the sake of Petitioners' argument, Mrs. Smith wanted to bequeath $10,000.00 to Paul and $5,000.00 to Christopher. The record reveals that Mrs. Smith did not have that much cash available at the end of her life. When her husband died in 2004, Mrs. Smith's financial assets consisted of four $10,000.00 certificates of deposit.[84] In the years following her husband's death, Mrs. Smith spent down these assets to pay her living expenses because her monthly income

---

[83] TT 118.
[84] TT 55.

was only between $800.00 and $850.00.[85]  According to Ralph, Jr., Mrs. Smith cashed her last certificate of deposit to pay for her funeral expenses.[86]

In the Will, Mrs. Smith left bequests to seven members of her extended "family."[87]  The specific bequests consist of a car to Tammy, a curio cabinet and contents to Kidwell, and a small cash gift ($1,000.00) to Candace.  The residuary estate is to be divided equally among six beneficiaries, Ralph, Jr., his wife Paula, Kidwell, Tammy, and Tammy's two young sons.  The evidence reveals that the five adult beneficiaries all had close relationships with Mrs. Smith, and the two minor children, especially Paul, had special places in Mrs. Smith's heart.  Although there was some feeling expressed at trial that Ralph III should have been included in his grandmother's will, Ralph III appears to have borrowed money from Mrs. Smith throughout his life and still owed her money when she died.[88]

There was testimony from Ralph, Jr. and Paula about a plan for Ralph, Jr. to borrow money against the property – Mrs. Smith's home – that he anticipated

---

[85] *Id.*

[86] TT 67-68.  According to his trial testimony, Ralph, Jr. was named in Mrs. Smith's living will as the person who was "going to pull the plug" on her when things were bad.  TT 77-78.  He also was named on Mrs. Smith's checking account.  TT 66, 78.  Ralph, Jr. testified that after paying the funeral bills, he still has what's left of his mother's money, and is holding the money to put into Paul's trust fund while this litigation is pending.  TT 58, 66.  Ralph, Jr. testified that if the will is not declared void, he may use the money to buy whatever he wants for himself, i.e., an excavator, boat, or motorcycle, because he knows what his mother wanted.  TT 66.

[87] Both Paul and Christopher referred to Mrs. Smith as "Mom-Mom."  TT 115.

inheriting upon Mrs. Smith's death, money that would be used to fund the trusts for Paul and Christopher.[89] Assuming that such a plan had been communicated to Mrs. Smith, she may have believed the plan was too complicated or risky. Assuming the plan had not been communicated to her, the evidence shows that Mrs. Smith was a frugal person and kept track of her money.[90] Toward the end of her life, Mrs. Smith would have known that she did not have enough money to leave specific monetary bequests to Tammy's children. She turned to a friend, instead of a family member, to assist her in drafting a will. And she distributed her small estate by leaving her only significant asset - her home - to six beneficiaries while giving Ralph, Jr. the option of buying out the other five co-owners, one of whom was his wife, if he wanted to become the sole owner of his mother's home.

Petitioners have failed to demonstrate by the preponderance of evidence that the Will was the product of undue influence. The Will appears to reflect the wishes of a stubborn and opinionated woman who valued hard work and family, and was generous to the people she loved.

Conclusion

---

[88] TT 39.
[89] TT 67-68, 118.
[90] TT, 34, 54.

For the reasons above, I recommend that the petition for review of proof of will be denied.  The parties are referred to Court of Chancery Rule 144 for the process of taking exception to a Master's Final Report.

Respectfully,

/s/ Kim E. Ayvazian

Kim E. Ayvazian
Master in Chancery